# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:24-CR-00099 |
| v. | (Chief Judge Brann)[*] |
| RAHEEL NAVIWALA, | |
| Defendant. | |
| UNITED STATES OF AMERICA, | No. 2:24-CR-00378 |
| v. | (Chief Judge Brann)[*] |
| DANIEL TORRES, | |
| Defendant. | |

## MEMORANDUM OPINION

### MARCH 9, 2026

After throwing off the fetters of despotism,[1] this nation's founding fathers were left with the task of "institut[ing] new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness."[2] Familiar with the dangers that attend the concentration of authority,[3] "[t]he Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty."[4]

---

[*] The Honorable Matthew W. Brann, Chief United States District Judge for the Middle District of Pennsylvania, sitting by designation.

[1] The Declaration of Independence (U.S. 1776).

[2] *Id.*

[3] *See id.* (enumerating grievances).

[4] *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

They erected such protections in the form of the separation of powers, a system of division that is inherent and explicit in the structure and provisions of the Constitution.[5] Through this division, the Framers hoped to "prevent[] the 'gradual concentration' of power in the same hands [by] enabl[ing] 'ambition to counteract ambition' at every turn."[6] The separation of powers cannot function on its own, however, because it will be the natural tendency of each branch to seek to expand its own power.[7] One branch's attempts "to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted" by the others.[8]

"The principle of separation of powers is embedded in the Appointments Clause,"[9] which divides the power to appoint officers of the United States between the President and the Senate.[10] Furthermore, the Constitution vests Congress with the exclusive power to create new offices.[11] To the Founders, dividing the appointment power was critical to defending against "despotism"[12]—their "experience with the English monarchy" taught them about the abuses that

---

[5]    *E.g.*, *Collins v. Yellen*, 594 U.S. 220, 245 (2021).

[6]    *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020).

[7]    *See Nat'l Lab. Rels. Bd. v. Noel Canning*, 573 U.S. 513, 593 (2014) (Scalia, J., concurring) ("All Presidents have a high interest in expanding the powers of their office, since the more power the President can wield, the more effectively he can implement his political agenda.")

[8]    *Bowsher*, 478 U.S. at 727 (quoting *Immigr. & Naturalization Servs. v. Chadha*, 462 U.S. 919, 951 (1983)).

[9]    *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 882 (1991).

[10]   U.S. Const. art. II, § 2, cl. 2.

[11]   *Myers v. United States*, 272 U.S. 52, 129 (1926).

[12]   *Freytag*, 501 U.S. at 883 (citing Gordon Wood, *The Creation of The American Republic 1776–1787*, 79, 143 (1969)).

accompanied "[t]he King['s] [ability to] wield significant power [to] both creat[e] and fill[] offices as he saw fit."[13] This division of power means that the President may not always be able to appoint his first choice to a specific office, and he may sometimes have to wait for the Senate to act, which can take time. But that is the point of this divided authority, not a defect.[14] "Friction between the branches is an inevitable consequence of our Constitutional structure,"[15] and "'[c]onvenience and efficiency' . . . 'are not the primary objectives' of our constitutional framework."[16]

One year into this administration, it is plain that President Trump and his top aides have chafed at the limits on their power set forth by law and the Constitution. To avoid these roadblocks, this administration frequently purports to have discovered enormous grants of executive power hidden in the vagaries and silences of the code.[17] Here, the Government proffers that, notwithstanding Congress's clear and unambiguous requirement of Presidential nomination and Senate confirmation before a person may exercise the powers of a United States Attorney—a limit established by the First Congress and unchanged for over 236 years—Congress also, through a tangled web of broad enactments using general language, simultaneously

---

[13] *Trump v. United States*, 603 U.S. 593, 645 (2024) (Thomas, J., concurring).

[14] *Noel Canning*, 573 U.S. at 538, 542, 556; The Federalist No. 76, at 406 (Alexander Hamilton) (Sweet Water Press ed., 2017) ("The person ultimately appointed must be the object of his preference, though perhaps not in the first degree.").

[15] *Noel Canning*, 573 U.S. at 556 (citing *Myers*, 272 U.S. at 293 (Brandeis, J., dissenting)).

[16] *Id.* at 579 (Scalia, J., concurring) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010)).

[17] *See, e.g.*, *Learning Resources, Inc. v. Trump*, 607 U.S. __ (2026); *Trump v. Illinois*, 607 U.S. __, 2025 WL 3715211 (Dec. 23, 2025) (per curiam) (denying application for stay).

authorized the Attorney General to ignore this requirement and appoint whomever she wants to do exactly the same job. And it contends that her ability to take appointments into her own hands is not limited to this office. On the Government's reading, the Attorney General can appoint anyone to any subordinate position in the Department of Justice and delegate them the authority to act in any other subordinate role, no matter how significant. That argument amounts to an enormous assertion of Presidential power.

"That is what this suit is about. Power. The allocation of power among Congress, the President, and the courts in such fashion as to preserve the equilibrium the Constitution sought to establish—so that 'a gradual concentration of the several powers in the same department,' can effectively be resisted."[18] The President here seeks the power to unilaterally appoint officers of his choosing to staff critical positions exercising vast authority Government-wide. Though the Government dresses its argument in sheep's wool of administrative necessity, "this wolf comes as a wolf."[19]

I conclude that the current leadership structure for the Office of the United States Attorney for the District of New Jersey exceeds the Attorney General's statutory authority to appoint inferior officers and delegate them powers and

---

[18] *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting) (citing The Federalist No. 51, at 273 (James Madison) (Sweet Water Press ed., 2017)).

[19] *Id.*

therefore constitutes a unilateral appointment in violation of the Appointments Clause. This finding requires disqualification of the Attorney General's appointees but does not compel dismissal of Defendant Raheel Naviwala's case. Defendant Daniel Torres, however, was indicted pursuant to authority unlawfully exercised by the prior officeholder, Alina Habba, and additional briefing is necessary to determine whether that indictment may stand. Furthermore, the Government is warned that any further attempts to unlawfully fill the office will result in dismissals of pending cases.

## I.    Factual Background

This is the second chapter of the saga concerning the leadership of the Office of the United States Attorney for the District of New Jersey. The events of chapter one are chronicled in *United States v. Giraud*.[20]

### A.    Leadership of the Office

After I determined that Alina Habba was unlawfully serving as the Acting United States Attorney for the District of New Jersey and disqualified her from that role, the Government appealed.[21] During the pendency of that appeal, several criminal cases pending in the District of New Jersey remained stayed under my jurisdiction, while others proceeded based on defendants' waiver of the United

---

[20]    795 F. Supp. 3d 560, 568-73 (D.N.J. 2025).
[21]    Notice of Appeal, *United States v. Giraud*, No. 1:24-CR-0768 (D.N.J. Aug. 25, 2025), Doc. 146.

States Attorney issue. The Government also continued to indict individuals under Ms. Habba's purported authority, arguing that she could continue to serve as the Acting United States Attorney by virtue of my decision to stay the Disqualification Order pending the Government's appeal.[22] On December 1, 2025, the United States Court of Appeals for the Third Circuit affirmed my decision.[23] A week later, on December 8, 2025, Ms. Habba resigned.[24]

The same day, Attorney General Pamela Bondi appointed and delegated authority to three individuals to run the United States Attorney's Office for the District of New Jersey ("USAO-NJ").[25] Philip Lamparello became Senior Counsel and was "authorize[d] . . . to supervise or conduct the work of the district's Criminal Division and Special Prosecution Division"; Jordan Fox was named a Special Attorney and "authorize[d] . . . to supervise or conduct the work of the district's Civil Division and Appellate Division . . . along with any other matters arising within the district not specifically delegated herein"; and Ari Fontecchio was named Executive Assistant United States Attorney and "authorize[d] . . . to supervise or conduct the

---

[22] Disqualification Order, *United States v. Giraud*, No. 1:24-CR-0768 (D.N.J. Aug. 21, 2025), Doc. 145.

[23] *United States v. Giraud*, 160 F.4th 390 (3d Cir. 2025), *reh'g denied*.

[24] Naviwala Doc. 268-1 (Habba Resignation Letter). The Government notes that Ms. Habba no longer supervises the USAO-NJ or its AUSAs "on a day-to-day basis," but confirmed that she still "may from time-to-time exercise supervision over specific cases or issues in the District of New Jersey." Naviwala Doc. 284 (Gov't Opp'n Br.) at 6.

[25] Naviwala Doc. 268-2 (DOJ Order No. 6510-2025) at 1. USAO-NJ refers to the organizational unit of the United States Attorney's Office for the District of New Jersey, which is distinct from the statutory Office of the United States Attorney. *See* Naviwala Doc. 302 (Oral Arg. Tr.) 16:16-17:8.

work of the district's Administrative Division, along with any other administrative matters arising within the district."[26] The Appointment Order cites 28 U.S.C. §§ 509 & 510 as authority for the delegations.[27] Notably, one accompanying explanatory memorandum states that the "proposed order would divide the responsibilities of the United States Attorney among [the] three officials,"[28] and another states that "[t]he proposed Order would delegate the responsibilities of the office of United States Attorney for the District of New Jersey to three officials."[29] The Government has confirmed that these three individuals have autonomy to make final decisions on the issues within their delegated purview.[30] I will refer to this leadership structure as the "triumvirate."

Other than these three appointments and delegations, it does not appear that the Government has changed anything about the operation of the USAO-NJ. With minor nonrelevant exceptions, the Office continues to be funded using appropriations earmarked for "Salaries and Expenses, United States Attorneys," and two of the three triumvirate members are paid through this appropriation.[31] "None

---

[26]  Naviwala Doc. 268-2 at 1.
[27]  *Id.* at 1.
[28]  *Id.* at 2.
[29]  *Id.* at 4.
[30]  Naviwala Doc. 302 at 44:7-19, 66:16-67:2. Although Deputy Attorney General Todd Blanche appears on the signature block of all of the filings discussed in this matter, the Government never argues that he actually reviews or approves any of these filings beyond his general "supervisory oversight." *Id.* at 44:17-19, 69:7-18; Naviwala Doc. 284 at 16. Thus, I do not consider any argument that the presence of Mr. Blanche's signature makes a meaningful difference in the outcome of these issues.
[31]  Naviwala Doc. 304-1 (DeJesus Decl.) ¶¶ 9-14.

of the leadership, Assistant United States Attorneys, and other Department of Justice staff operating in the District of New Jersey are compensated from funds appropriated under the 'General Legal Activities, Salaries and Expenses' heading in DOJ's annual appropriations act, which cover 'expenses necessary for the legal activities of the Department of Justice.'"[32] DOJ has not issued any Administrative rules or guidance explaining the purported change in its structure other than the Appointment Order.

One other factual point must be noted. The Government *explicitly concedes* that "[t]he Rube Goldberg-style delegation mechanism employed" here is not necessary to keep the office running.[33] At the time of oral argument, at least three *undisputedly legal* methods were *immediately available* to fill the United States Attorney's position and resolve this controversy.[34] First and second, two paths under the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345(a)(2) and (a)(3), permit the President to designate an individual with specific qualifications to perform the United States Attorney's functions and duties as long as time remains under 5 U.S.C. § 3346.[35] And third, the Judges of the District of New Jersey may still appoint a

---

[32]  *Id.* ¶ 14.

[33]  *See New Process Steel, L.P. v. Nat'l Lab. Rels. Bd.*, 560 U.S. 674, 682 (2010).

[34]  *See* Naviwala Doc. 302 at 10:11-11:25 ("[W]e are not saying, obviously, that there are not alternatives to the current supervisory structure.").

[35]  *See id.* at 10:14-21. As the Government notes, the second 210-day period for acting service under 5 U.S.C. § 3346(b)(1) expired on February 19, 2026. But the Government can extend the deadlines by submitting a second nomination to the Senate, which allows acting service to continue while the nomination is pending and for yet another 210-day period if the nomination fails. 5 U.S.C. § 3346(b)(2)(B).

United States Attorney to serve *indefinitely* until a nominee is confirmed pursuant to 28 U.S.C. § 546(d).[36] An appointment under any of these provisions would give the Government the power to move prosecutions ahead and ratify past actions that have not yet been invalidated.[37] Additionally, the President could at any time fill the office by nominating someone to be confirmed by the Senate.[38] The Government acknowledges that these are viable methods.

With all these options remaining, why does the fate of thousands of criminal prosecutions in this District potentially rest on the legitimacy of an unprecedented and byzantine leadership structure? The Government tells us: the President doesn't like that he cannot simply appoint whomever he wants.[39] Notwithstanding the chaos that pervades criminal prosecutions in this District, and without regard to the possibility that scores of dangerous criminals could have their cases dismissed or convictions eventually reversed, "the [E]xecutive branch, at least right now, is not prepared to . . . use [the legal] options."[40]

Moreover, this issue is not limited to the District of New Jersey. The Office of the United States Attorney for at least five other Districts is currently vacant,[41]

---

[36]  Naviwala Doc. 302 at 11:3-6.
[37]  I do not offer any opinion on the validity or scope of ratifications.
[38]  28 U.S.C. § 541(a).
[39]  Naviwala Doc. 302 at 11:7-25 ("The caveat for all of this is . . . the President is the one who designates that person [under the FVRA] . . . And for the judicial appointment provision to work, the person the Court appoints has to be somebody who is acceptable to the President.").
[40]  Naviwala Doc. 302 at 12:5-10.
[41]  The number is higher, but I limit my review for the sake of concision.

and in each case it appears that the Government is running the office through a delegation of authority to an individual of the Attorney General and President's unilateral choice.[42] In two of these Districts the Judges recently used their statutory power under section 546(d) to select a United States Attorney and fill the vacancy.[43] In both cases the President fired their selection within *hours*[44] and the Deputy

---

[42] *About the District*, United States Attorney's Office, Eastern District of Virginia, https://www.justice.gov/usao-edva (last visited Mar. 5, 2026) (listing as "Leadership" "J. Frank Bradsher," "Executive Assistant U.S. Attorney"); *About the District*, United States Attorney's Office, Northern District of New York, https://www.justice.gov/usao-ndny (last visited Mar. 5, 2026) (listing as "Leadership" "John A. Sarcone III," "First Assistant U.S. Attorney"); *About the District*, United States Attorney's Office, District of Nevada, https://www.justice.gov/usao-nv (last visited Mar. 5, 2026) (listing as "Leadership" "Sigal Chattah," "First Assistant U.S. Attorney"); *About the District*, United States Attorney's Office, Central District of California, https://www.justice.gov/usao-cdca (last visited Mar. 5, 2026) (listing as "Leadership" "Bilal A. Essayli," "First Assistant U.S. Attorney"); *About the District*, United States Attorney's Office, District of New Mexico, https://www.justice.gov/usao-nm (last visited Mar. 5, 2026) (listing as "Leadership" "Ryan Ellison," "First Assistant U.S. Attorney").

[43] *United States Attorney for the Northern District of New York*, United States District Court, Northern District of New York (Feb. 11, 2026), https://www.nynd.uscourts.gov/news/united-states-attorney-northern-district-new-york-0 ("Pursuant to 28 U.S. Code § 546(d), the Board of Judges for the Northern District of New York appointed Donald T. Kinsella as the United States Attorney for the Northern District of New York."); *Appointment of Interim United States Attorney by the United States District Court for the Eastern District of Virginia, Pursuant to Title 28, United States Code, Section 546(d)*, United States District Court, Eastern District of Virginia (Feb. 20, 2026), https://www.vaed.uscourts.gov/news/appointment-interim-united-states-attorney-united-states-district-court-eastern-district ("The Judges of the United States District Court for the Eastern District of Virginia have unanimously appointed James W. Hundley as Interim United States Attorney for the Eastern District of Virginia, pursuant to 28 U.S.C. § 546(d).").

[44] *See* Jonah E. Bromwich, *U.S. Attorney Chosen to Replace Trump Pick Is Quickly Fired by White House*, N.Y. Times (Feb. 12, 2026); *Re: United States Attorney for the Northern District of New York*, United States District Court, Northern District of New York (Feb. 12, 2026), https://www.nynd.uscourts.gov/news/re-united-states-attorney-northern-district-new-york (noting that "[t]he Court exercised its authority under 28 U.S.C. § 546(d)" to appoint Donald T. Kinsella as United States Attorney, but "[b]y the end of the day, Deputy Director of Presidential Personnel, Morgan DeWitt Snow notified Mr. Kinsella that he was removed as the judicially- appointed United States Attorney, without explanation"); Alan Feuer, *Longtime Virginia Lawyer Chosen by Judges as U.S. Attorney, and Then Fired*, N.Y. Times (Feb. 20, 2026).

Attorney General made combative (and legally incomplete) posts clearly indicating

that the Department of Justice would not permit anyone to hold any United States

Attorney's office if that person was not handpicked by the President.[45]

It is crystal clear and not capable of factual dispute that the Government's

conduct in this case is intended to fill the Office of the United States Attorney for

the District of New Jersey unilaterally.

Based on this finding, I ignore any argument the Government offers based on

a practical need to operate the USAO-NJ.[46] The contention that there must be some

simple and ready way to continue the functions of the USAO-NJ despite a vacancy

in the Office of the United States Attorney is not well taken because Congress has

established a comprehensive statutory scheme to ensure that the Office *is never*

---

[45] Todd    Blanche    (@DAGToddBlanche)    (Feb.    11,    2026,    9:46    p.m.),    X, https://x.com/DAGToddBlanche/status/2021777972215062787 ("Judges don't pick U.S. Attorneys, @POTUS does. See Article II of our Constitution. You are fired, Donald Kinsella."); Todd Blanche (@DAGToddBlanche) (Feb. 20, 2026, 6:43 p.m.), X, https://x.com/DAGToddBlanche/status/2024993246175261137 ("Here we go again. EDVA judges do not pick our US Attorney. POTUS does. James Hundley, you're fired!"). As I will explain in detail *infra*, Article II of the Constitution *explicitly permits* Judges to appoint inferior officers when authorized by Congress, U.S. Const. art. II, § 2, cl. 2, and Congress has granted Judges authority to select United States Attorneys under the exact factual circumstances that the Government agrees exist in these cases. 28 U.S.C. § 546(d). Mr. Blanche may be suggesting that 28 U.S.C. § 546(d) is unconstitutional, but that would be problematic for the administration-selected United States Attorneys currently serving pursuant to that statute. *See, e.g.*, *Statement of United States Attorney Jay Clayton on Court Appointment*, United States Attorney's    Office,    Southern    District    of    New    York    (Aug.    18,    2025), https://www.justice.gov/usao-sdny/pr/statement-united-states-attorney-jay-clayton-court-appointment; *Meet the U.S. Attorney*, United States Attorney's Office, Eastern District of New York (Nov. 26, 2025), https://www.justice.gov/usao-edny/staff-profile/meet-us-attorney ("Joseph Nocella, Jr., was sworn in as the United States Attorney for the Eastern District of New York on September 2, 2025, following his appointment by the judges of the district.").

[46] *See* Naviwala Doc. 284 at 1, 17-18.

*totally vacant.* As long as the President is willing to find compromise, there is no reason that someone cannot always be performing the functions and duties of the office in complete conformity with the law.[47] Yet through its statements and actions, the Administration has made clear that it cares far more about *who* is running the USAO-NJ than *whether it is running at all.*[48] While I strongly disagree with that order of priority, I take the same approach.

Shortly after Attorney General Bondi announced the triumvirate, several criminal defendants in the District of New Jersey moved to disqualify it from exercising the functions and duties of the Office of the United States Attorney for the District of New Jersey. One of the first challenges arose in *United States v. Naviwala*,[49] which was already pending before this Court by virtue of Naviwala's previous challenge to Ms. Habba's authority.[50] In light of Ms. Habba's resignation, I remanded all cases with a pending disqualification motion to the originally assigned judges, but retained Naviwala's case based on the new authority challenge. Chief Judge Michael A. Chagares of the United States Court of Appeals for the Third

---

[47]   *See* 28 U.S.C. §§ 541(a), 546(a), 546(d); 5 U.S.C. § 3345(a).
[48]   This comment does not apply to the "loyal employees in the U.S. Attorney's office," *Giraud*, 160 F.4th at 393, who have clearly demonstrated that they care deeply about doing their important work and have shown an admirable commitment to that purpose. Naviwala Doc. 302 137:2-8.
[49]   No. 2:24-CR-0099 (D.N.J.).
[50]   *See* Naviwala Doc. 248 (Transfer Order).

Circuit redesignated this Court to preside over challenges to the triumvirate on December 18, 2025.[51]

Following the new designation, I set in a schedule for briefing Naviwala's motion.[52] Around the same time, another authority challenge arose in *United States v. Torres*.[53] That matter was transferred to me on December 19, 2025, pursuant to Chief Judge Chagares's designation order in *Naviwala*,[54] and I consolidated the cases and set *Torres* on the *Naviwala* briefing schedule.[55] Other cases have since been transferred; I have stayed all of them pending resolution of the authority issue in these matters.

Following briefing, I held oral argument on January 23, 2026.[56] I then gave the parties two weeks to submit supplemental briefs addressing questions I posed at argument.[57] Additionally, following the United States Supreme Court's February 20, 2026, decision in *Learning Resources, Inc. v. Trump*,[58] the Defendants moved to file another supplemental brief, which I permitted over the Government's objection.[59] All briefing is now complete, and the motions are ripe for resolution.

---

[51]   Naviwala Doc. 270 (Designation Order).
[52]   Naviwala Doc. 274 (Briefing Order).
[53]   Mot. to Disqualify, *United States v. Torres*, No. 2:24-CR-0378 (D.N.J. Dec. 12, 2025), Doc. 91.
[54]   Torres Doc. 92 (Transfer Order).
[55]   Torres Doc. 94 (Consolidation & Briefing Order).
[56]   Naviwala Doc. 293 (Sch. Order).
[57]   *See* Naviwala Docs. 301, 303 (Suppl. Br. Order & Extension), 306 (Extension).
[58]   607 U.S. __, 2026 WL 477534 (2026).
[59]   *See* Naviwala Doc. 314 (Suppl. Br. Order).

## B.    Pertinent Case-Specific History

Naviwala's case is currently at the sentencing phase.[60] On February 28, 2025, he was convicted of six counts and acquitted of two counts following a jury trial.[61] Following his conviction, Naviwala filed a motion for acquittal and sought multiple continuances of the sentencing hearing.[62] After then-presiding Judge Michael E. Farbiarz set a firm date for the sentencing hearing,[63] Ms. Habba's appointment came into question, and Naviwala raised the issue in his case.[64] Judge Farbiarz therefore continued all pending proceedings and transferred the case to me, where it has remained.[65]

Torres was indicted on June 10, 2024.[66] Following pretrial motions, the Government returned a superseding indictment on November 10, 2025.[67] That indictment was signed by Alina Habba and Assistant United States Attorney Eli Jacobs.[68] About a week later, Torres moved to disqualify Ms. Habba,[69] and then-presiding Judge Katherine S. Hayden permitted briefing on that issue to determine

---

[60]    *See* Naviwala Doc. 237 (Order Sch. St'g Hrg.)

[61]    Naviwala Doc. 176 (Jury Verdict).

[62]    Naviwala Doc. 186 (Mot. for Acquittal); Naviwala Doc. 203 (Mot. for Extension); Naviwala Doc. 219 (Mot. to Continue Hrg.); Naviwala Doc. 227 (Mot. to Continue St'g and Second Mot. for Extension); Naviwala Doc. 231 (Mot. to Continue St'g); *see* Naviwala Doc. 237 (Text Order noting "[t]he Defendant has repeatedly sought to move his sentencing").

[63]    Naviwala Doc. 237.

[64]    Naviwala Doc. 241 (Letter).

[65]    Naviwala Doc. 248.

[66]    Torres Doc. 21 (Indictment). This indictment was signed by Senate-confirmed United States Attorney Philip R. Sellinger.

[67]    Torres Doc. 77 (Superseding Indictment).

[68]    *Id.*

[69]    Torres Doc. 80 (Mot. to Disqualify).

whether Torres's arguments were duplicative of the issues pending on appeal in *Giraud*.[70] Judge Hayden then scheduled Torres's trial to begin on January 26, 2026.[71] Shortly thereafter, Ms. Habba resigned and Torres revised his argument to challenge the triumvirate.[72] The case was then transferred to me, and I adjourned Torres's trial at the Government's request.[73]

## II.    Threshold Issues

Before reaching the merits of this dispute, I must resolve three threshold issues based on the prior litigation that Defendants contend prevent the Government from making this appointment even if it is technically permissible. First, Defendants argue that the Government should be judicially estopped from pursuing the divided delegation it is now using because it argued in *Giraud* that any such division would be indistinct from its delegation of the functions and duties of the United States Attorney to Ms. Habba.[74] Second, Defendants contend that the Government waived an argument in favor of the triumvirate because it failed to raise the issue in *Giraud*.[75] Third, the Defendants briefly and somewhat obliquely argue that once judicial appointment under 28 U.S.C. § 546(d) becomes available, it is exclusive.[76] These arguments lack merit, and I reject them all.

---

[70] Torres Docs. 81, 82 (Br. Orders).
[71] Torres Minute Entry of Dec. 3, 2025.
[72] Torres Doc. 91 (Mot. to Dismiss & Disqualify).
[73] Torres Docs. 92, 93, 94.
[74] Naviwala Doc. 281 (Mot.) at 12-17.
[75] Naviwala Doc. 281 at 17-18.
[76] *See* Naviwala Doc. 281 at 21-23, 24; Torres Doc. 91 at 7.

### A.    Judicial Estoppel

The doctrine of judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."[77] The rule is intended to "protect the integrity of the judicial process," and therefore is "invoked by a court at its discretion."[78] In this Circuit, courts consider three criteria to determine whether application of judicial estoppel is appropriate in a given case. "First, the party to be estopped must have taken two positions that are *irreconcilably inconsistent*. Second, judicial estoppel is unwarranted unless the party changed his or her position in bad faith—i.e., with intent to play fast and loose with the court. Finally, a district court may not employ judicial estoppel unless it is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct."[79] Furthermore, the Third Circuit has explained that, as to the second element, "a change of position simply cannot evidence bad faith *vis-a-vis* a court unless the initial statement was accepted or adopted" by the original court.[80]

---

[77] *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)).

[78] *Id.* at 749-50 (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982) and *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)).

[79] *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir. 2003) (quoting *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 2001)) (emphasis in original).

[80] *Montrose Med. Grp.*, 243 F.3d at 784; *see Maine*, 532 U.S. at 750-51 ("[C]ourts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.' Absent success in a

This final statement of law dooms Defendants' argument: the Government's contention that a divided delegation would be absurd was not accepted or applied by either court in *Giraud*. Instead, both courts carefully distinguished that situation from the issues they decided.[81] And now that the Government's prior interpretation of the law—which underpinned its argument about a divided delegation—has turned out to be incorrect, it has not acted in bad faith by formulating a new argument under the law as it now stands.[82] The Defendants briefly contend in reply that acceptance of the prior argument "is not . . . an independent requirement for application of the doctrine of judicial estoppel," quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*[83] But the relevant part of *Ryan* was narrowed and distinguished by the Third Circuit in *Montrose Medical Group Participating Savings Plan v. Bulger*,[84] which formally held that "it does not constitute bad faith to assert contrary positions in different proceedings when the initial claim was never accepted or adopted by a

---

prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity." (internal citations omitted)).

[81] *United States v. Giraud*, 795 F. Supp. 3d 560, 600 n.257 (D.N.J. 2025) ("I do not express any opinion on the possibility of parceling out these duties to separate individuals or delegating only a clearly limited subset of nonexclusive and delegable duties."); *United States v. Giraud*, 160 F.4th 390, 406 (3d Cir. 2025) ("[I]t is possible a more dispersed delegation of authority might not create a *de facto* U.S. Attorney and therefore might not run afoul of the FVRA's exclusivity provision—though we do not decide that today because those are not the facts of this case.").

[82] *See G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) (declining to apply judicial estoppel when trial court did not rely on initial position).

[83] Naviwala Doc. 296 (Reply) at 4 (quoting 81 F.3d 355, 361 (3d Cir. 1996)); *see also* Naviwala Doc. 281 at 15 (quoting *G-I Holdings*, 586 F.3d at 262)

[84] 243 F.3d at 783 ("*Ryan Operations* never stated that judicial estoppel could validly be applied in a case where the initial position was never accepted by a court or agency.").

17

court or agency."[85] That holding is regularly repeated in binding appellate precedent.[86] Even in *G-I Holdings, Inc v. Reliance Insurance Co.*, where the panel noted that the doctrine could apply where a court did not rely on the initial position, some detrimental reliance was still necessary.[87] Here, no one but the Government relied on its first position.

Furthermore, "judicial estoppel is an extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice. It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts. Judicial estoppel is not a sword to be wielded by adversaries unless such tactics are necessary to secure substantial equity."[88] Here, the Government's inconsistency—raised only on appeal in response to a footnote from my Memorandum Opinion and used to support an argument that *any* delegation, singular or divided, is permissible—does not fundamentally alter the proceedings. And applying the rule here would only protract the confusion pervading the prosecutions of countless criminal cases without passing on the actual legality of the Government's conduct. Imposing such

---

85  *Id.* at 782.
86  *In re ESML Holdings Inc.*, 135 F.4th 80, 92 (3d Cir. 2025) ("[J]udicial estoppel does not apply when a party's initial position was not 'accepted or adopted by a court or agency.'").
87  *G-I Holdings*, 586 F.3d at 262 (noting that the doctrine could apply where "creditors almost certainly had relied on [the initial position], undermining the bankruptcy process" (citing *Krystal Cadillac*, 337 F.3d at 324-25)).
88  *Ryan Operations*, 81 F.3d at 365 (internal quotations omitted).

consequences for an inconsistency so trifling would be the true inequity, and I would decline to use the doctrine even if it could apply here.[89]

## B.    Waiver

Waiver is even less applicable than judicial estoppel. "Failure to raise an issue . . . constitutes a waiver of the argument."[90] But a party need not raise issues based on facts that differ from those before the court to preserve them for future litigation. Any such argument would be purely hypothetical and wholly irrelevant to the resolution of a case that does not involve those facts. Indeed, as the Government points out, such arguments would depend on "contingent future events that may not occur as anticipated, or indeed may not occur at all," and therefore would not have been "fit for adjudication" in the initial case.[91] Even if the Government had pressed the argument, doing so would have been futile, because federal courts are not permitted to issue "an opinion advising what the law would be upon a hypothetical state of facts."[92]

---

[89]    *See G-I Holdings*, 586 F.3d at 262 ("We believe applying judicial estoppel here presents a greater threat to judicial integrity.").

[90]    *Reform Party of Allegheny Cnty. v. Allegheny Cnty. Dep't of Elections*, 174 F.3d 305, 316 (3d Cir. 1999) (quoting *Brenner v. Local 514, United Brotherhood of Carpenters*, 927 F.2d 1283, 1298 (3d Cir. 1991)).

[91]    *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) and *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163 (1967)).

[92]    *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

Applying waiver as Defendants contend would turn litigation into a nightmare where parties must anticipate and assert every possible set of facts that might ever arise under any interpretation of a law or risk forever forfeiting that position. That is not how waiver works.[93]

### C.     Section 546(d)

When the Office of a United States Attorney is vacant following an interim appointment under 28 U.S.C. § 546(a), 28 U.S.C. § 546(d) authorizes "the district court [to] appoint a United States attorney to serve until the vacancy is filled." Defendants contend that the District Court's power is exclusive, and that, once section 546(d) is triggered, other methods of filling the Office must give way.[94] But, as the Government correctly recalls,[95] I already considered and rejected that argument in the prior litigation.[96] To the extent that Defendants are attempting to raise a distinct argument that the President does not have authority to terminate a section 546(d) appointment,[97] I reject that argument too. I previously suggested that the President's section 541(c) power to terminate a United States Attorney applies to one appointed under section 546(d),[98] and I see no sound textual basis for reading

---

[93]  *See also Higgins v. Mississippi*, 217 F.3d 951, 955 (7th Cir. 2000) ("[A] waiver made for purposes of one lawsuit needn't have been intended to carry over to another.").

[94]  Torres Doc. 91 at 6-7; Naviwala Doc. 302 at 27:9-22

[95]  Naviwala Doc. 302 at 36:22-37:5.

[96]  *Giraud*, 795 F. Supp. 3d at 582-84.

[97]  *See* Naviwala Doc. 296 at 26 n.81 ("Absent a PAS-approved candidate at the ready, the Government did not have the power to remove Ms. Grace.").

[98]  *Giraud*, 795 F. Supp. 3d at 583.

an exception into section 541(c). Granted, the Supreme Court has historically held that "[t]he power to remove is, in the absence of statutory provision to the contrary, an incident of the power to appoint,"[99] but here, section 541(c) *is* the statutory provision addressing removal of a United States Attorney. In any event, recent Supreme Court precedent has called into question Congress's power to deprive the President of the power to remove officers,[100] so my facially supported reading of the statutory scheme is reinforced by the canon of Constitutional avoidance.[101]

## III. Merits Analysis

Turning now to the merits, I begin summarizing the parties' arguments. Next, I explain the legal background, including the Constitution's Appointments Clause and the intertwined separation of powers doctrine, the Federal Vacancies Reform Act ("FVRA"), and historical and current statutes that structure the Department of Justice ("DOJ"). Based on that legal framework, I answer three scoping questions that guide the entire analysis: (1) whether to view the triumvirate as a whole; (2) how much power has been delegated; and (3) what is the source of that power.

With that guidance in mind, I turn to Defendants' first argument that the Attorney General's delegation to the triumvirate is barred under the FVRA as interpreted by myself and the United States Court of Appeals for the Third Circuit

---

[99] *See Burnap v. United States*, 252 U.S. 512, 515 (1920) (collecting authority).

[100] *See, e.g.*, *Seila Law LLC v. Consumer Fin. Protect. Bureau*, 591 U.S. 197, 213-14 (2020).

[101] *See United States v. Norwood*, 49 F.4th 189, 210 (3d Cir. 2022) (quoting *Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422, 435 (3d Cir. 2016)).

in *United States v. Giraud*.[102] I find that the FVRA's exclusivity provision prohibits the current leadership structure.

Next, I consider Defendants' second point: that the Appointments Clause prohibits the Government's conduct. Based on an analysis of the relevant Constitutional provisions and statutes, I agree that the Government has exceeded its power and, as a result, has violated the Appointments Clause.

Finally, based on my conclusion that the triumvirate is acting unlawfully, I determine what remedy is appropriate as to each Defendant. Both are entitled to disqualification. Naviwala's case will not be dismissed; Torres's dismissal motion requires additional development.

## A.    Summary of Arguments

As they are the movants, I begin with Defendants' arguments contending that the triumvirate is unlawfully exercising authority. I then summarize the Government's arguments in response.

### 1.    Defendants

Defendants offer two primary points to contend that the triumvirate is unlawful.

First, they contend that the Attorney General has delegated to the collective triumvirate a set of powers that is commensurate with the vacant Office of the United

---

[102]    *Giraud*, 160 F.4th 402-06.

States Attorney. That kind of delegation, they contend, creates a three-headed *de facto* United States Attorney, which is prohibited by the FVRA as interpreted in *Giraud*.[103]

Second, Defendants contend that the Government's conduct violates the Appointments Clause of the United States Constitution and the doctrine of separation of powers by infringing on the Senate's advice and consent role, which is embodied in the United States Attorney statute, 28 U.S.C. § 541.[104]

### 2.    Government

As in *Giraud*, the Government assembles a convoluted patchwork of statutory cross-references to craft a leadership structure that it contends can do anything a United States Attorney can, without being a United States Attorney.

The Government agrees that the Office of the United States Attorney for the District of New Jersey is currently vacant.[105] No one holds this position by virtue of Presidential nomination and Senate confirmation,[106] an interim appointment,[107] or an acting appointment.[108] Although it does not comply with any of these undisputedly

---

[103] Naviwala Doc. 281 at 18-24; Torres Doc. 91 at 4-7
[104] Naviwala Doc. 281 at 24-28.
[105] Naviwala Doc. 302 at 16:14-17:8.
[106] 28 U.S.C. § 541.
[107] 28 U.S.C. § 546; *see Giraud*, 795 F. Supp. 3d at 582 (holding that section 546 appointment expired on July 1, 2025).
[108] 5 U.S.C. § 3345; *see Giraud*, 160 F.4th at 397-402 (holding that Ms. Habba was not properly appointed under the FVRA).

available statutory appointment methods, the Government explains that the triumvirate is legally permissible for two reasons.

First, none of the three members of the triumvirate is exercising all of the functions and duties of the Office of the United States Attorney; each is vested with only a subset of the United States Attorney's powers.[109] Specifically, Mr. Lamparello handles criminal and "special prosecution" matters, Ms. Fox supervises civil and appellate cases, as well as anything else not expressly delegated, Mr. Fontecchio is in charge of administrative issues.[110] By dispersing the United States Attorney's powers, the Government contends that it has not created a "*de facto*" United States Attorney.[111]

Second, the Government contends that the functions and duties that have been delegated to the triumvirate stem from the Attorney General, not the United States Attorney.[112] Specifically, the Government explains that the members of the triumvirate were appointed by the Attorney General pursuant to statutes vesting her with the authority to appoint inferior officers. Mr. Lamparello and Ms. Fox were appointed "Special Attorneys" under 28 U.S.C. § 515(b), and Mr. Fontecchio was appointed as an Assistant United States Attorney ("AUSA") under 28 U.S.C. §

---

[109] As I explained *supra*, at note 81, this exact issue was left open in the *Giraud* litigation.

[110] *See* Naviwala Doc. 268-2 at 1; Naviwala Doc. 284 at 15 ("[T]he delegations at issue here do not purport to delegate to any single person all, or anything close to all, the authority of a U.S. Attorney.").

[111] Naviwala Doc. 284 at 15; *see Giraud*, 160 F.4th at 403.

[112] Naviwala Doc. 284 at 11-13; Naviwala Doc. 302 at 73:3-11.

542.[113] The Government also cites, without ever explaining when they were formally

invoked or applied, 5 U.S.C. § 3101 and 28 U.S.C. § 533.[114] Subsequent to these

appointments, the Attorney General then employed 28 U.S.C. § 510 to delegate her

own authority to direct litigation and oversee cases, as set forth in 28 U.S.C. §§ 516-

519, in limited part to each of these three individuals to create a delegation that, in

total, parallels the authority of a United States Attorney.[115] And, lest there be any

doubt, the Government also cites 28 U.S.C. § 509, presumably for the proposition

that any powers vested in the United States Attorney are also vested in the Attorney

General, which she can redelegate.[116]

---

[113] *See* Naviwala Doc. 284 at 6; Naviwala Doc. 268-2 at 1. The Government at one point argues that Ms. Fox has special authority as an Associate Deputy Attorney General to exercise powers delegated to her by the Deputy Attorney General ("DAG"). Naviwala Doc. 284 at 35. But the provision it cites only permits the DAG to redelegate a specific subset of powers, all of which deal with appointment and hiring. 28 C.F.R. § 0.15(c) (permitting redelegation of powers only in specific matters, all of which refer to appointment or employment); *id.* § 0.15(e) (permitting secondary redelegation by officials authorized to perform "attorney personnel duties"). These redelegable powers do not include the authority to substantively supervise litigation, so Ms. Fox has no additional relevant authority by virtue of her position in the DAG's office. *Compare* 28 C.F.R. § 0.13(a) (authorizing "Assistant Attorney[s] General and Deputy Assistant Attorney[s] General . . . to designate Department attorneys to conduct any legal proceeding."). To the extent the Government believes that 28 C.F.R. § 0.15(b)(1)(v) includes litigation supervision in the phrase "general administration of Assistant United States Attorneys," I disagree, and read that catch-all phrase to apply only to employment-related matters based on the preceding list of terms and the *ejusdem generis* canon. *Schaar v. Lehigh Valley Health Servs., Inc.*, 598 F.3d 156, 160 (3d Cir. 2010) (applying canons of statutory interpretation to regulations); *Fischer v. United States*, 603 U.S. 480, 487 (2024) (defining *ejusdem generis*).

[114] *See* Naviwala Doc. 284 at 4.

[115] Naviwala Doc. 268-2 at 1; Naviwala Doc. 284 at 3-4, 13, 15 ("[P]ursuant to express statutory authority, the Attorney General has delegated *her own powers*." (emphasis in original)).

[116] Naviwala Doc. 268-2 at 1.

### B.    Legal Background

Based on these arguments, I first review the Constitutional provisions, including the Appointments Clause and the separation of powers, that underlie this dispute. I then describe the relevant statutory structure, including the FVRA and the DOJ's organic acts.

#### 1.    Constitutional Provisions[117]

"The Constitution is the supreme law of the land, and no act of Congress," nor of the Executive, "is of any validity which does not rest on authority conferred by that instrument."[118] Three Constitutional provisions define the powers at issue in this case. The Appointments and Necessary and Proper Clauses give Congress the explicit authority to create offices, and the Appointments Clause permits it to determine how the offices it creates may be filled. And the structural concept of the separation of powers is "embedded" in the Appointments Clause.[119]

"The 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive

---

[117] Parts of this section are drawn verbatim from my discussion of the same provisions in *Giraud*.

[118] *United States v. Germaine*, 99 U.S. 508, 510 (1878); *see La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

[119] *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 882 (1991).

power."[120] Responding to that problem, the Framers devised the Appointments Clause.[121] The Clause provides that:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United states, whose appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.[122]

Appointments Clause jurisprudence recognizes three tiers of Government actor, each of which is subject to different appointment rules under the Constitution. Principal officers are generally subordinate only to the President, and exercise broad authority without direct control from a superior (other than the President).[123] The principal officers "encompass at least the Heads of Departments."[124] Principal officers can only be appointed through Presidential appointment and Senatorial consent (offices subject to this process are often called "PAS" offices).[125] The PAS rule combines the benefits of vesting the selection of officers in a single person[126]

---

[120] *Id.* at 501 U.S. at 883 (citing Gordon Wood, *The Creation of The American Republic 1776–1787*, 79, 143 (1969)).

[121] U.S. Const. art. II, § 2, cl. 2.

[122] *Id.*

[123] *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025) (citing *Edmond v. United States*, 520 U.S. 651, 662 (1997) and *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021)). The early "district attorneys," which I discuss *infra*, were likely principal officers. *See* Naviwala Doc. 302 at 77:6-25.

[124] *Kennedy*, 606 U.S. at 761.

[125] *Edmond*, 520 U.S. at 659-60.

[126] *See* The Federalist No. 76, at 405 (Alexander Hamilton) (Sweet Water Press ed., 2017) (discussing problems with selection of officials by an assembly).

with the "check upon a spirit of favoritism in the President" that "cooperation of the Senate" offers.[127] Thus, "[t]he Senate's advice and consent power is a critical 'structural safeguard of the constitutional scheme,'"[128] protecting against unilateral appointment by the President of "candidates who ha[ve] no other merit than that . . . of being in some way or other personally allied to him, or of possessing the necessary insignificance and pliancy to render them the obsequious instruments of his pleasure."[129]

Next, inferior officers "are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."[130] This relationship to a principal officer is the primary consideration in determining whether an officer is "inferior."[131] Of course, in a complex government there will be many of these inferior officers to appoint[132] and "[t]he constitutional process of Presidential appointment and Senate confirmation . . . can take time."[133] Anticipating this issue, the Framers added the Constitution's "Excepting Clause" for "administrative convenience," permitting Congress to either retain the "default" PAS rule for inferior officers or allow their direct appointment

---

[127] *Id.* at 406-07.
[128] *Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 580 U.S. 288, 293 (2017) (quoting *Edmond*, 520 U.S. at 659).
[129] The Federalist No. 76, at 407.
[130] *Edmond*, 520 U.S. at 663
[131] *Kennedy*, 606 U.S. at 761; *Arthrex*, 594 U.S. at 13 (quoting *Edmond*, 520 U.S. at 662-63).
[132] *Germaine*, 99 U.S. at 510.
[133] *SW Gen.*, 580 U.S. at 293.

by either the President, a Department Head, or the courts.[134] Additionally, "[s]ince President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval."[135] This framework is designed to carefully balance the separation of powers and prevent "one branch's aggrandizing its power at the expense of another branch"[136] while at the same time ensuring that the work of Government gets done.[137]

The principal and inferior officer definitions of course beg the question "what is an 'officer?'" In *Buckley v. Valeo*, the Supreme Court explained that "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by s 2, cl. 2, of . . . Article [II]."[138] Officers, which must fall into one of the two classifications above, are distinct from "employees of the United States," who are "lesser functionaries subordinate to officers of the United States."[139] The central question is whether the actor exercises "significant authority," for, if he does

---

[134] *Edmond*, 520 U.S. at 660; *Arthrex*, 594 U.S. at 12.

[135] *SW Gen.*, 580 U.S. at 294.

[136] *Freytag*, 501 U.S. at 878, 882.

[137] Everyone agrees that United States Attorneys are inferior officers. *See* Naviwala Doc. 302 at 123:7-13.

[138] 424 U.S. 1, 126 (1976).

[139] *See id.* at 126 n.162 (citing *Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) and *Germaine*, 99 U.S. 508).

not, he is not an officer and must, *ergo*, be an employee.[140] As to employees, "the Appointments Clause cares not a whit about who named them."[141]

Even more fundamentally, by virtue of the Necessary and Proper and Appointments Clauses, Congress—and only Congress—has the Constitutional power to *create* the offices that the officers will fill.[142] As a corollary proposition, the Executive may not create offices, principal or inferior.[143] This structure—

---

[140] *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (citing *Buckley*, 424 U.S. at 126); *Edmond*, 520 U.S. at 662 ("The exercise of 'significant authority pursuant to the laws of the United States' marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley*, the line between officer and nonofficer." (citing *Buckley*, 424 U.S. at 126)).

[141] *Lucia*, 585 U.S. at 245 (citing *Germaine*, 99 U.S. at 510).

[142] *Myers v. United States*, 272 U.S. 52, 129 (1926) ("To Congress under its legislative power is given the establishment of offices, the determination of their functions and jurisdiction, the prescribing of reasonable and relevant qualifications and rules of eligibility of appointees, and the fixing of the term for which they are to be appointed and their compensation—all except as otherwise provided by the Constitution."); *Buckley*, 424 U.S. at 138-39 ("Congress may undoubtedly under the Necessary and Proper Clause create 'offices' in the generic sense and provide such method of appointment to those 'offices' as it chooses. But Congress' power under that Clause is inevitably bounded by the express language of Art. II, s 2, cl. 2, and unless the method it provides comports with the latter, the holders of those offices will not be 'Officers of the United States.'"); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010) ("No one doubts Congress's power to create a vast and varied federal bureaucracy."); *see Seila Law*, 591 U.S. at 266 (Kagan, J., concurring in part and dissenting in part) ("[A]s Madison told the first Congress, the legislature gets to 'create the office, define the powers, and limit its duration.' The President, as to the construction of his own branch of government, can only try to work his will through the legislative process." (internal alterations and citations omitted)); Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment As Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87, 100-01 (2019) ("[T]he Constitution commits the power to create federal offices to Congress under the Necessary and Proper Clause."); E. Garrett West, Note, *Congressional Power Over Office Creation*, 128 Yale L.J. 166 (2018); Yonaton Gelblum, *Why Congress Cannot Delegate Authority to Create Offices, But Can Authorize Administrative Delegations From Offices*, 69 Wayne L. Rev. 385, 399-400 (2024).

[143] The Federalist No. 69, at 369 (Alexander Hamilton) (contrasting the President from the British King and noting that "[t]he king of Great Britain is emphatically and truly styled the fountain of honor. He not only appoints to all offices, *but can create offices*." (emphasis added)); *Myers*, 272 U.S. at 160 ("The head of a department has no constitutional prerogative of appointment

dividing the office creating and office filling powers—was intentional: "[t]he Framers' experience with post-revolutionary self-government had taught them that combining the power to create offices with the power to appoint officers was a recipe for legislative corruption."[144]

One final question arises from this discussion: "what is an 'office?'" Of course, an office usually involves a title, but the true substance of an office comes from the functions and duties its holder is authorized to exercise. In effect, the terms "office" and "officer" are merely labels with which to describe one who is authorized

---

to offices independently of the legislation of Congress, and by such legislation he must be governed, not only in making appointments, but in all that is incident thereto." (quoting *United States v. Perkins*, 116 U.S. 483, 485 (1886)); *Trump v. United States*, 603 U.S. 593, 644-45 (2024) (Thomas, J., concurring) ("Before the President or a Department Head can appoint any officer, however, the Constitution requires that the underlying office be 'established by law' . . . And 'established by law' refers to an office that Congress creates 'by statute.'"); *id.* at 650 ("If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to unilaterally create and then fill that office."); *Seila Law*, 591 U.S. at 231 ("Congress's 'plenary control over the salary, duties, and even existence of executive offices' makes 'Presidential oversight' *more* critical." (quoting *Free Enter. Fund*, 561 U.S. at 500)); *id.* at 266 (Kagan, J., concurring in part and dissenting in part) (Article II "does not . . . give the President authority to decide what kinds of officers—in what departments, with what responsibilities—the Executive Branch requires."); *Freytag*, 501 U.S. at 885 ("The Appointments Clause prevents Congress from distributing power too widely by limiting the actors in whom Congress may vest the power to appoint. The Clause reflects our Framers' conclusion that widely distributed appointment power subverts democratic government."); Calabresi & Lawson, *supra* note 142, at 101.

[144] *Freytag*, 501 U.S. at 904 (Scalia, J., concurring); *Trump*, 603 U.S. at 645 (Thomas, J., concurring) ("The limitation on the President's power to create offices grew out of the Founders' experience with the English monarchy. The King could wield significant power by both creating and filling offices as he saw fit."); *see Weiss v. United States*, 510 U.S. 163, 187 n.2 (1994) (Souter, J., concurring) ("Indeed, the Framers added language to both halves of the Appointments Clause specifically to address the concern that the President might attempt unilaterally to create and fill federal offices." (citing Charles Warren, The Making of the Constitution 642 (1937))).

by law to perform a specific set of functions and duties.[145] As now-Judge Jennifer L. Mascott has explained, founding-era "[l]egal dictionaries . . . mak[e] . . . clear[] that the position of 'officer' involve[s] responsibility for a governmental duty."[146] That duty-focused definition has remained consistent since the founding.[147] And this definition goes hand-in-hand with the Appointments Clause definition of "officer," which primarily asks about the "authority" the given "appointee exercis[es]."[148]

The sum total of these Constitutional rules is that, because Congress's office-creating power is exclusive, the Executive may not alter or expand the powers

---

[145] *See Gomez v. United States*, 490 U.S. 858, 864 (1989) ("When a statute creates an office to which it assigns specific duties, those duties outline the attributes of the office."); *Lucia*, 585 U.S. at 253 (Thomas, J., concurring) ("I would resolve that question based on the original public meaning of 'Officers of the United States.' To the Founders, this term encompassed all federal civil officials 'with responsibility for an ongoing statutory duty.'").

[146] Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev. 443, 488 (2018) ("Numerous public statements from the 1770s to the 1780s also associated officers with the concept of duty.").

[147] *Officer*, Black's Law Dictionary (1st ed. 1891) ("The incumbent of an office; one who is lawfully invested with an office. One who is *charged by a superior power (and particularly by government) with the power and duty of exercising certain functions.*" (emphasis added)); *Office,* Black's Law Dictionary (1st ed. 1891) ("[A] right to exercise a public or private employment and to take the fees and emoluments thereunto belonging . . . The most frequent occasions to use the word arise with reference to a duty and power conferred on an individual by the government; and, when this is the connection, 'public office' is a usual and more discriminating expression. But a power and duty may exist without immediate grant from government, and may be properly called an 'office.'"); *Office*, Black's Law Dictionary (2d ed. 1910) (same); *Office*, Black's Law Dictionary (4th rev. ed. 1968) ("Right to exercise public or private employment, and to take the fees and emoluments thereunto belonging, whether public, as those of magistrates, or private, as of bailiffs, receivers, or the like. . . . A right, *and correspondent dut*y, to exercise a public trust. . . . *An 'assigned duty' or 'function.'*" (emphasis added)); *Office*, Black's Law Dictionary (12th ed. 2024) ("A position of *duty*, trust, or *authority*, esp. one conferred by a governmental authority for a public purpose." (emphasis added)); *Officer*, Black's Law Dictionary (12th ed. 2024) ("In public affairs, the term refers esp. to a person holding public office under a national, state, or local government, *and authorized by that government to exercise some specific function*" (emphasis added)).

[148] *Buckley*, 424 U.S. at 125-26; *cf.* 5 U.S.C. § 5102(a)(3) ("'position' means the work, consisting of the duties and responsibilities, assignable to an employee").

of a Congressionally defined office without Congressional authorization.[149] For the Executive to unilaterally increase the powers of an office beyond those defined by Congress would doubly violate the Constitution, once by abridging Congress's power to create offices, and again by filling the new office using an appointment method that Congress has not chosen.[150]

*    *    *

In *Giraud*, I advocated for, but did not formally apply, a clear statement rule for Appointments Clause legislation.[151] In addition to the argument set forth there, I note that I am far from the sole advocate for such a rule. Justice Clarence Thomas, joined by Justices Samuel Alito and Neil Gorsuch in dissent in *Kennedy v. Braidwood Management, Inc.*, contended that Congress may provide for a departure from the default PAS rule "only if it does so expressly."[152] Justice Thomas explained that:

---

[149] *See Weiss*, 510 U.S. at 172 ("Congress repeatedly and consistently distinguished between an office that would require a separate appointment and a position or duty to which one could be 'assigned' or 'detailed' by a superior officer."); *Al Bahlul v. United States*, 967 F.3d 858, 874 (D.C. Cir. 2020); West, *supra* note 142, at 211 (noting that the concept of Congress's exclusive office-creating power "also supports the structural inference that the President should not be granted plenary, unenumerated power respecting the creation and deployment of the government's officers.").

[150] Indeed, even *Congress* may not expand the powers of an existing office without limit. In those cases, the Supreme Court has warned that "Congress [is] circumventing the Appointments Clause by unilaterally appointing an incumbent to a new and distinct office" unless the new powers are "germane" to those of the existing office. *Weiss*, 510 U.S. at 173-75 (citing *Shoemaker v. United States*, 147 U.S. 282 (1893)).

[151] *See Giraud*, 795 F. Supp. 3d at 574-75 ("Congress is expected to speak clearly when it rebalances the separation of powers.").

[152] 606 U.S. at 794 (Thomas, J. dissenting); *id.* at 797 ("The Clause permits a more informal method of appointment only when Congress affirmatively chooses one, and Congress has

The vesting of appointment authority must be explicit. When reading two legal texts together, the "specific controls" over the "general." *National Cable & Telecommunications Assn., Inc. v. Gulf Power Co.*, 534 U.S. 327, 335-336 (2002). The Appointments Clause's default rule of appointment by the President with Senate confirmation specifically addresses how an inferior officer is to be appointed. Appointment authority therefore cannot be deemed implicit in a more general grant of authority to a department head; only a provision that specifically addresses appointment can displace the default. And, because the Appointments Clause's default rule, as a *constitutional* provision, is of greater "dignity" than a *statute*, we should not presume that Congress meant to set it aside if the question is doubtful. *See* A. Scalia & B. Garner, Reading Law 187 (2012). In particular, we cannot infer appointment authority from a principal officer's authority to supervise an inferior officer. By its default rule, the Appointments Clause *presumes* that an inferior officer will act at the direction of a principal officer and yet be appointed by the President with Senate confirmation.[153]

In *United States v. Trump*, the Honorable Aileen Cannon writing for the United States District Court for the Southern District of Florida similarly explained why a clear statement rule would be appropriate in the Appointments Clause context, but, as with my approach in *Giraud*, found its application unnecessary because the case was resolvable using standard means of statutory interpretation.[154] Commentators have similarly argued that the Appointments Clause embodies a "constitutionally prescribed clear statement rule."[155]

---

retained the default of requiring Senate confirmation in many cases where it is not constitutionally required.").

[153] *Id.* at 804-05 (internal citations shortened); *see Weiss*, 510 U.S. at 171 (explaining how Congress discusses appointments as opposed to assignment of additional duties).

[154] 740 F. Supp. 3d 1245, 1261-63 (S.D. Fla. 2024).

[155] Calabresi & Lawson, *supra* note 142, at 93.

Here, I adopt my earlier reasoning and find that a clear statement rule applies to statutes passed pursuant to the Appointments Clause.[156] Congress must be explicit when it creates an office, and when it applies the excepting clause to vest appointment power in the President alone, a Head of a Department, or a Court of Law.[157] True, "Congress need not use magic words to confer appointment authority" on the Department Head,[158] but the relevant statutory scheme must still clearly create an office and provide for a method to fill it.[159] When faced with ambiguity, the Court will not assume that an office exists, imply appointment power, or read expansively provisions which are ambiguous about the authority which can be vested in an officer appointable under the clause. Unless Congress clearly states that an officer with certain authority may be appointed without Presidential nomination and Senate consent, the Executive may not take such action.

## 2.   FVRA[160]

When a PAS office is vacant, as all agree is the case here, the Federal Vacancies Reform Act, 5 U.S.C. § 3345, gives the Executive Branch a number of

---

[156] Because I adopt a clear statement rule, I find it unnecessary to apply the related major questions doctrine in this case. *See* Naviwala Doc. 315 at 5 (comparing major questions doctrine to clear statement rule (citing *Learning Resources, Inc. v. Trump*, 607 U.S. __, 2026 WL 477534, at *25 (2026) (Gorsuch, J., concurring))).

[157] *Kennedy*, 606 U.S. at 804 (Thomas, J. concurring).

[158] *Id.* at 780 (majority op.).

[159] *See id.* at 755-57, 762-70, 780-81 (reasoning that statutory scheme establishing U.S. Preventive Services Task Force created inferior offices for Task Force members); *id.* at 780-81 (explaining that "context" of statute plainly creating offices with explicit duties guided interpretation of appointment provision); 42 U.S.C. § 299b-4(a)(2) (listing "duties of the Task Force").

[160] Much of this discussion is drawn verbatim from *Giraud*. 795 F. Supp. 3d at 575-77.

options to temporarily authorize the performance of that office's functions and duties by a different officer. The FVRA provides that "[i]f an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office," "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity,"[161] or "notwithstanding" the first assistant's assumption of acting status, "the President (and only the President) may direct" either another PAS officer or "an officer or employee of such Executive agency" who "during the 365-day period preceding the [vacancy] . . . served in a position in such agency for not less than 90 days" and held a position with a rate of pay at GS-15 or higher to "perform the functions and duties of the officer temporarily in an acting capacity."[162] In *Giraud*, the Third Circuit held that the first assistant provision functions automatically and thus applies only to the first assistant serving at the time the vacancy occurs.[163]

The FVRA also bars from acting service officers who meet one of the above requirements if, "during the 365-day period preceding the [vacancy], such person . . . did not serve in the position of first assistant to the office of such officer; or . . .

---

[161]  5 U.S.C. § 3345(a)(1).
[162]  *Id.* §§ 3345(a)(2), (3); *see SW Gen.*, 580 U.S. at 295-96.
[163]  *Giraud*, 160 F.4th at 400.

served in the position of first assistant to the office of such officer for less than 90 days; and . . . the President submits a nomination of such person to the Senate for appointment to such office."[164] The next subsection "creates an exception to this prohibition, providing that [it] 'shall not apply to any person' serving in a first assistant position that itself requires the Senate's advice and consent."[165] In *Giraud*, the Third Circuit held that this provision applies to any person that has been nominated for appointment to the office, even if that nomination has been withdrawn.[166]

The FVRA sets a 210-day limit for acting service "beginning on the date the vacancy occurs."[167] If the vacancy exists during "the 60-day period beginning on a transitional inauguration day," the 210-day clock begins 90 days after the vacancy or inauguration day, whichever is later.[168] When the President submits a nomination for the office to the Senate, acting service can continue throughout the pendency of the nomination,[169] and, if the nomination is "rejected . . ., withdrawn, or returned to the President," a new 210-day period of acting service is triggered on the day of the "rejection, withdrawal, or return."[170] A second nomination again tolls the FVRA's

---

[164] 5 U.S.C. § 3345(b)(1)
[165] *SW Gen.*, 580 U.S. at 296 (quoting 5 U.S.C. § 3345(b)(2)).
[166] *Giraud*, 160 F.4th at 401-02.
[167] 5 U.S.C. § 3346(a)(1).
[168] *Id.* § 3349a(b).
[169] *Id.* § 3346(a)(2).
[170] *Id.* § 3346(b)(1).

clock during its pendency,[171] and the acting officer may serve for a final 210-day period if the second nomination also fails.[172]

The FVRA further provides that "[s]ections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [PAS] office of an Executive agency . . . unless . . . a statutory provision expressly authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specific office temporarily in an acting capacity; or . . . designates an officer or employee" to do the same.[173] The exclusivity provision also makes an exception for recess appointments.[174] Finally, the exclusivity provision explicitly notes that the exception in section 3347(a)(1) for office-specific statutes does not apply to "[a]ny statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head to, or to reassign duties among, officers or employees of such Executive agency."[175]

Last, the FVRA imposes consequences for its violation. It provides that "[u]nless an officer or employee is performing the functions and duties [of a vacant office] in accordance with sections 3345, 3346, and 3347," "the office shall remain

---

[171] *Id.* § 3346(b)(2)(A).
[172] *Id.* § 3346(b)(2)(B).
[173] *Id.* §§ 3347(a)(1)(A), (B).
[174] *Id.* § 3347(a)(2).
[175] *Id.* § 3347(b).

vacant" and "only the head of such Executive agency may perform any function or duty of such office."[176] Furthermore, "[a]n action taken by a person who is not acting under section 3345, 3346, or 3347," or the head of the Department, "in the performance of a function or duty of a vacant office . . . shall have no force or effect," and "may not be ratified."[177] As explained in *Giraud*, the definition of "function or duty" in this specific provision of the FVRA includes only the "exclusive and nondelegable" duties of the vacant office.[178]

### 3. DOJ Statutory Structure

The structure of the modern DOJ is a result of its historical trajectory. A review of that history is helpful to understand the sometimes-unintuitive authorities at play within the Department.[179]

"The Federal Judiciary Act of September 24, 1789, was Senate Bill No. 1, in the First Session of the First Congress."[180] The Act established federal District Courts in each state,[181] structured the Supreme Court and the early Courts of Appeals,[182] and

---

[176] *Id.* §§ 3348(b)(1), (2). "Function or duty" is narrowly defined for purposes of this section, under provisions that I will return to later.

[177] *Id.* §§ 3348(d)(1), (2).

[178] *Giraud*, 795 F. Supp. 3d at 596.

[179] *See Bahlul v. United States*, 840 F.3d 757, 764-65 (D.C. Cir. 2016) (en banc) (Kavanaugh, J., concurring).

[180] Charles Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L. Rev. 49, 49 (1923). This history is largely drawn from Rebecca Roiphe, *A Typology of Justice Department Lawyers' Roles and Responsibilities*, 98 N.C.L. Rev. 1077, 1083-91 (2020).

[181] Judiciary Act of 1789, ch. 20, §§ 3-4, 1 Stat. 73, 73-75; *see* Sara Sun Beale, *Rethinking the Identity and Role of United States Attorneys*, 6 Ohio St. J. Crim. L. 369, 392 (2009).

[182] Judiciary Act of 1789, ch. 20, §§ 1, 4-6, 1 Stat. 73, 73-76.

created the position of the "district attorney," "a meet person learned in the law to act as attorney for the United States in such district, . . . whose duty it shall be to prosecute in such district all delinquents for crimes and offences, cognizable under the authority of the United States, and all civil actions in which the United States shall be concerned."[183] Congress also created the office of the Attorney General and empowered the officer to "to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned, and to give his advice and opinion upon questions of law when required by the President of the United States."[184] The Judiciary Act did not describe a method of appointment for either the Attorney General or the District Attorneys, so "the President, consistent with the Appointments Clause, assumed responsibility for nominating district attorneys and submitted nominees to the advice and consent of the Senate."[185]

Under the Judiciary Act, the Attorney General had no supervisory power over the district attorneys,[186] who for approximately forty years did not report to anyone

---

[183] *Id.* § 35, 1 Stat. at 92; *see Parsons v. United States*, 167 U.S. 324, 338 (1897).

[184] Judiciary Act of 1789, ch. 20, § 35, 1 Stat. 73, 93.

[185] Ross E. Wiener, *Inter-Branch Appointments After the Independent Counsel: Court Appointment of United States Attorneys*, 86 Minn. L. Rev. 363, 376 (2001).

[186] Beale, *supra* note 181, at 393 ("The first Congress declined to give the attorney general the authority to supervise the U.S. Attorneys."); Jed Handelsman Shugerman, *The Creation of the Department of Justice: Professionalization Without Civil Rights or Civil Service*, 66 Stan. L. Rev. 121, 129 (2014) ("[T]he Act did not mention any authority of the Attorney General over the district attorneys. Over the next eight decades, the Attorney General exercised no control over them."); *id.* at 131 ("In the very beginning, the Attorney General had no power over the district attorneys or their appointment process . . . In practice, district attorneys were not really supervised at all.").

(other than the President),[187] and then reported to the Secretary of the Treasury.[188] Indeed, although the First Congress "created the State Department, the War Department, and the Treasury Department, [it] did not give the Attorney General a department or any staff."[189] Thus, under the statute, "[t]he attorney general was more of a general attorney rather than an officer statutorily empowered to command other governmental attorneys."[190] It was not until 1861 that the Attorney General gained supervisory authority over the District Attorneys, and even then the power was shared, and the "[s]ettled rule [wa]s that those courts will not recognize any suit, civil or criminal, as regularly before them, if prosecuted in the name and for the benefit of the United States, unless the same is represented by the district attorney, or some one designated by him to attend to such business, in his absence, as may appertain to the duties of his office."[191] This initial structure of the Executive's prosecutorial power reflected an effort to avoid "centraliz[ation] of the federal legal

---

[187] *See* Saikrishna Prakash, *The Chief Prosecutor*, 73 Geo. Wash. L. Rev. 521, 553 (2005) (stating that the first Presidents "believed that they had constitutional authority to direct federal district attorneys").

[188] Bruce A. Green & Rebecca Roiphe, *Can the President Control the Department of Justice?*, 70 Ala. L. Rev. 1, 41 n.196 (2018).

[189] Shugerman, *supra* note 186, at 131.

[190] Prakash, *supra* note 187, at 552.

[191] *The Confiscation Cases*, 74 U.S. 454, 457 (1868) (Further noting that "Public prosecutions, until they come before the court to which they are returnable, are within the exclusive direction of the district attorney, and even after they are entered in court, they are so far under his control that he may enter a *nolle prosequi* at any time before the jury is empanelled for the trial of the case.").

power."[192] Congress maintained prosecutorial decentralization for nearly the first century of the Republic.[193]

After the Civil War, Congress took heed of "the increasing need for efficiency and uniformity in federal law," and in 1870 created the Department of Justice.[194] The legislation established that the Attorney General would head the newly created Department, and authorized him to "conduct and argue any case in which the government is interested, in any court of the United States, or [] require the solicitor-general or any officer of his Department to do so."[195] While the Act preserved the existing requirement of Presidential nomination and Senate confirmation for the pre-established officers consolidated in the DOJ,[196] it also authorized the Attorney General to appoint and remove "[a]ll the other officers, clerks, and employees in the said Department."[197] Furthermore, the Act authorized the Attorney General to "require any solicitor or officers of the Department of Justice to perform any duty

---

[192] Roiphe, *supra* note 180, at 1084 (citing Luther A. Huston, The Department of Justice 7 (1967)); Beale, *supra* note 181, at 393-94.

[193] Roiphe, *supra* note 180, at 1084-86. It is worth noting that this decentralization did not create many uniformity problems because the District Attorneys "had too little work to require much attention" given the paucity of the federal criminal code. Shugerman, *supra* note 186, at 132; Wiener, *supra* note 185, at 376 ("As Congress had enacted few federal criminal statutes, the district attorneys conducted relatively few criminal prosecutions.").

[194] Roiphe, *supra* note 180, at 1086; Act of June 22, 1870, ch. 150, 16 Stat. 162.

[195] Act of June 22, 1870, ch. 150, § 5, 16 Stat. at 162-63; *see id.* ("[T]he solicitor-general, or any other officer of the Department of Justice, may be sent by the Attorney-General to any State or district in the United States to attend to the interests of the United States in any suit pending in any of the courts of the United States.").

[196] *Id.* § 9, 16 Stat. at 163.

[197] *Id.*

required of said Department or any officer thereof."[198] Even more specifically, the Attorney General was given "supervision of the conduct and proceedings of the various attorneys for the United States in the respective judicial districts . . . and also of all other attorneys and counselors employed in any cases or business in which the United States may be concerned,"[199] and the "accounts" associated therewith.[200] An earlier statute had already tasked the "Attorney-General . . . with the general superintendence and direction of the attorneys and marshals of all the districts in the United States and the Territories as to the manner of discharging their respective duties," and authorized him "to employ and retain . . . such attorneys and counsellors-at-law as he may think necessary to assist the district-attorneys in the discharge of their duties."[201] This has essentially remained the structure of the DOJ, as it relates to United States Attorneys, since its creation.

Despite the centralization of prosecutorial authority within the DOJ, the United States Attorneys retain independent statutory authority for prosecutions within their district.[202] Furthermore, United States Attorneys are not—and have

---

[198] *Id.* § 14, 16 Stat. at 164.

[199] *Id.* § 16, 16 Stat. at 164.

[200] *Id.* § 15, 16 Stat. at 164.

[201] An Act Concerning the Attorney-General and the Attorneys and Marshals of the Several Districts, ch. 37, §§ 1-2, 12 Stat. 285, 285-86 (1861); *see* Beale, *supra* note 181, at 395 ("The Attorney General was first given supervisory authority over the U.S. Attorneys in 1861, and in 1870 Congress created the Department of Justice and incorporated the U.S. Attorneys into the new department."); *United States v. Crosthwaite*, 168 U.S. 375 (1897) (discussing Attorney General's power to appoint "assistant district attorneys" and to authorize special counsel to assist the district attorneys or the Attorney General in specific cases).

[202] 28 U.S.C. § 547.

never been—appointed or removable by the Attorney General.[203] For essentially as long as the Constitution has been this Country's governing document, United States Attorneys have been subject to Presidential appointment and Senate confirmation. As a normative matter, "[i]n part because U.S. Attorneys operated without interference from Washington, D.C. for one hundred years, they retain an autonomy and independence from Washington, D.C. that is 'perhaps unmatched by any other field service in the federal government.'"[204] "This practice of decentralized criminal enforcement 'has acquired a special power in the context of the federal system, in which even legislators of the [P]resident's party see U.S. [A]ttorneys as providing a critical counterweight to Washington politics.'"[205] Based on this history and structure, it is clear that Congress believes that "the dispersal of authority [in the United States Attorneys] has continuing value in the federal system."[206]

---

[203] 28 U.S.C. §§ 541(a), (c).

[204] Wiener, *supra* note 185, at 380.

[205] *Id.* at 382.

[206] Beale, *supra* note 181, at 391; *see* Attorney General Robert H. Jackson, *The Federal Prosecutor* 31 Am. Inst. Crim. L. & Criminology 3, 3-4 (1940) ("Your responsibility in your several districts for law enforcement and its methods cannot be wholly surrendered to Washington, and ought not to be assumed by a centralized Department of Justice. It is an unusual and rare instance in which the local District Attorney should be superseded in the handling of litigation, except where he requests help of Washington. It is also clear that with his knowledge of local sentiment and opinion, his contact with and intimate knowledge of the views of the court, and his acquaintance with the feelings of the group from which jurors are drawn, it is an unusual case in which his judgment should be overruled.
Experience, however, has demonstrated that some measure of centralized control is necessary. In the absence of it different district attorneys were striving for different interpretations or applications of an Act, or were pursuing different conceptions of policy. Also, to put it mildly, there were differences in the degree of diligence and zeal in different districts. To promote uniformity of policy and action, to establish some standards of performance, and to make available specialized help, some degree of centralized administration was found necessary.

Today, three statutes directly permit someone to fill the Office of the United States Attorney or temporarily perform its functions and duties.[207] First, and most obviously, the United States Attorney statute, 28 U.S.C. § 541, provides that a United States Attorney shall be appointed by the President and confirmed by the Senate, and shall serve for a term of four years.[208] Second, when the Office of the United States Attorney is vacant, 28 U.S.C. § 546 specifically permits the Attorney General to appoint a United States Attorney for an interim period of, at most, 120 days.[209] Once the Attorney General's interim appointment lapses, section 546(d) permits the relevant District Court to appoint a United States Attorney to "serve until the vacancy is filled."[210] Third, if a vacancy persists despite section 546 (or if the Executive chooses not to use section 546),[211] the Federal Vacancy Reform Act authorizes a select group of officials to temporarily perform of the functions and duties of a vacant office that, like the United States Attorney, is subject to Presidential appointment and Senate confirmation.[212]

---

Our problem, of course, is to balance these opposing considerations. I desire to avoid any lessening of the prestige and influence of the district attorneys in their districts. At the same time we must proceed in all districts with that uniformity of policy which is necessary to the prestige of federal law.").

[207] *See In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*, __ F. Supp. 3d __, 2026 WL 60793, at *5-6 (N.D.N.Y. 2026).

[208] 28 U.S.C. § 541. The four-year term is automatically extended until a successor is appointed.

[209] 28 U.S.C. §§ 546(a)-(c); *Giraud*, 795 F. Supp. at 579-82 (holding that the Attorney General may appoint multiple individuals under section 546 but for no more than 120 days in aggregate); *United States v. Comey*, __ F. Supp. 3d __, 2025 WL 3266932, at *5-9 (E.D. Va. 2025) (similar).

[210] 28 U.S.C. § 546(d).

[211] *See Giraud*, 795 F. Supp. 3d at 582-84.

[212] 5 U.S.C. §§ 3345-46; *In re Grand Jury Subpoenas*, 2026 WL 60793, at *6.

45

As the Government explains in detail, Attorneys General of today are vested with immensely more authority than their founding-era predecessors. "The Attorney General is the head of the Department of Justice."[213] All litigation of the United States "is reserved to officers of the Department of Justice, under the direction of the Attorney General,"[214] and the Attorney General "supervise[s] all litigation to which the United States, an agency, or officer thereof is a party, and . . . direct[s] all United States attorneys, assistant United States attorneys, and special attorneys . . . in the discharge of their respective duties."[215] The Attorney General "may personally conduct and argue any case in a court of the United States in which the United States is interested, or [s]he may direct the Solicitor General or any officer of the Department of Justice to do so."[216] All of the functions of subordinate DOJ officers (with minor exceptions) "are vested in the Attorney General,"[217] and the Attorney General may delegate "any function" of hers to "any other officer, employee, or agency of the Department of Justice."[218]

---

[213] 28 U.S.C. § 503.

[214] 28 U.S.C. § 516.

[215] 28 U.S.C. § 519.

[216] 28 U.S.C. § 518(b); *see also* 28 U.S.C. § 515(a) (permitting DOJ officers to, "when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct").

[217] 28 U.S.C. § 509.

[218] 28 U.S.C. § 510.

C.    **Scope of Delegation & Standing**

With this background in mind, it becomes clear that the parties fundamentally disagree on several legal and factual issues bearing on the scope of both the FVRA and Constitutional inquiries and which will, in significant part, decide this case. These questions therefore must be resolved at the outset.

First, the Government takes the position that the triumvirate members' authority should be viewed independently, because each holds his or her own office and is assigned specific powers. The Defendants argue that the triumvirate has been appointed and delegated authority to fill a singular, statutorily defined office, and that I should therefore consider them to be a single, collective appointment.

Second, based on its answer to the first question, the Government contends that none of the triumvirate members acts with all of the power of a United States Attorney, and that each wields power than can be lawfully assigned to his or her office. The Defendants look to the collective power of the triumvirate and assert that it matches that of the United States Attorney.

And, third, the Government asserts that the power that has been delegated to the triumvirate members is the Attorney General's own power to conduct, direct, and supervise litigation stemming from 28 U.S.C. §§ 515, 516, 517, 518, and 519. The Defendants argue that the delegated power is that of the United States Attorney, stemming from section 547.

After a review of what relevant authority exists, I agree with the Defendants on each point.

### 1.    The Collective Triumvirate

I first conclude that I must view the delegation to the triumvirate as a whole. Under the FVRA's statutory terms, the *only* lens for conducting the analysis must be the collective functions and duties of the vacant office.[219] Each provision of the FVRA focuses on the ability to "perform the functions and duties of the [vacant] office," or prohibitions on such performance.[220] So the only way to properly determine if the FVRA is being invoked or violated is view the "functions and duties" of a vacant office collectively, and determine whether they are being performed consistently with the FVRA.

Furthermore, Appointments Clause challenges should be construed liberally.[221] "[A] litigant challenging governmental action as void on the basis of the separation of powers" need only demonstrate that he "'sustain[s] injury' from an executive act that allegedly exceeds the official's authority."[222] And when action is

---

[219]  *See* 5 U.S.C. § 3345.
[220]  *Id.* §§ 3345(a)(1)-(3), 3347(a)-(b). *Cf.* Naviwala Doc. 310 at 6-7 (arguing based on its text that the FVRA "applies to *all* the functions and duties *of the PAS office in question in whole.*" (first emphasis in original, second emphasis added)).
[221]  *Ryder v. United States*, 515 U.S. 177, 183 (1995) (advising against approaching Appointment Clause issues in a way that would "create a disincentive" to challenge other "questionable . . . appointments.").
[222]  *Seila Law*, 591 U.S. at 211 (citing *Free Enter. Fund*, 561 U.S. at 512 n.12 and *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)); *id.* (applying rule to cases where a litigant is "challenging governmental action as void on the basis of the separation of powers").

taken in violation of the separation of powers "it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court."[223] The Defendants argue that the Government has impermissibly filled a statutorily defined inferior office—that of the United States Attorney for the District of New Jersey—without using the method of appointment that Congress authorized pursuant to the Appointments Clause,[224] and is using the authority of this improperly filled office in their cases. Considering the fact that an office is defined by its statutorily assigned functions and duties,[225] to determine whether the Government has invalidly filled an inferior office, the inquiry must focus on the functions and duties of *that office*. For it is only by taking this view of the authority in question that a court can determine whether it is being improperly exercised.[226]

In a related situation, when the Supreme Court in *Freytag* considered whether special trial judges of the Tax Court had been appointed in violation of the Appointments Clause, it refused to limit its inquiry to only the statutory power that the special trial judges exercised in the challengers' case.[227] The Supreme Court

---

[223] *Id.* at 212.

[224] *See Freytag*, 501 U.S. at 883 (reasoning that Congress's power to provide for non-PAS methods of appointments "is inevitably bounded by the express language of [the Appointments Clause]" (quoting *Buckley*, 424 U.S. at 138-39)).

[225] *See supra* at 31-32 (explaining that an office is defined by its functions and duties); *Lucia*, 585 U.S. at 253 (quoting Mascott, *supra* note 146, at 564)).

[226] *Giraud*, 795 F. Supp. 3d at 594-95 (reasoning that "a narrow view of how the delegation applies in these cases alone . . . obscures the validity of the delegation in the first place by ignoring its full scope. But if the delegation is unlawful, then so are all of its applications.").

[227] *Freytag*, 501 U.S. at 881-82.

instead looked to the full statutory authority of those officers to determine their status, reasoning that "[t]he fact that an inferior officer on occasion performs duties that may be performed by an employee not subject to the Appointments Clause does not transform his status under the Constitution."[228] This case—though presented in a different context—is the same.

The focus here must be on the full statutory duties of the office that is alleged to have been unlawfully filled. The fact that its statutory duties are divvied up and assigned away does not "transform" an office's status under the law. If the functions and duties of the challenged officials match with those of the statutory office, then they are holding the same office, and the challenged officials must be appointed in the statutorily required way.[229]

More generally, based on these approaches, it is clear that both the Appointments Clause and the FVRA focus on "the result to be achieved" by the Government's actions, rather than "whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful."[230] So "even if separate elements of [the Government's] scheme are lawful, when they are bound together

---

[228] *Id.* at 882.

[229] Both of these inquiries are limited to a circumstance in which the disputed office is being *filled* in a way that does not comport with the office-creating statute. The FVRA only applies when the office is vacant. And an officer's delegation of her own authority while in office, even if complete, is not subject to the same argument, as the officer retains her own authority to supervise and overrule the delegees wielding her power. Challenges like the Defendants' can therefore only feasibly be raised when the office at issue is vacant or, theoretically, when a properly appointed officer has been entirely shunted to the side by usurpers.

[230] *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946).

by a common interest as parts of an unlawful scheme" to abridge the these provisions, "the plan may make the parts unlawful."[231] When the Government, in a single order, takes three actions to achieve a specific and explicitly stated goal, it would require willful blindness to "tightly compartmentaliz[e] the various factual components and wip[e] the slate clean after scrutiny of each."[232] Instead, I look at the effect of the Government's action and determine whether it is statutorily permitted to achieve that result.

To the extent it is in dispute,[233] the above discussion also establishes that the Defendants have standing to challenge the powers of the full triumvirate, whether or not a given appointee will act in these cases. As in the removal cases, the Defendants will be aggrieved if action is taken in their cases by an official without valid authority.[234] And whether *any* member of the triumvirate has valid authority depends on whether their *collective* functions and duties match those of the vacant office.[235]

---

[231] *United States v. United Shoe Machinery Co. of N.J.*, 247 U.S. 32, 86 (1918) (quoting *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905)); *see Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355-56 (4th Cir. 2024), *cert. denied*, 2026 WL 79821 (U.S. Jan. 12, 2026).

[232] *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 60 (E.D. Pa. 2022) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)) (internal quotation marks omitted).

[233] *But see Seila Law*, 591 U.S. at 211 (reasoning that *defendants* could raise a Constitutional objection to Government action regardless of their own standing).

[234] *Id.* at 212 ("Our precedents have long permitted private parties aggrieved by an official's exercise of executive power to challenge the official's authority to wield that power while insulated from removal by the President.").

[235] *See Freytag*, 501 U.S. at 882 (considering all functions and duties of the challenged officer, whether or not applicable in the instant case).

So to determine whether they have suffered an "injury . . . that can be remedied by a court," the Defendants may challenge the full triumvirate.[236]

### 2.    Scope of Delegation

With the inquiry's breadth in hand, I now turn to the facts. And the record makes abundantly clear that the triumvirate exercises the functions and duties of the United States Attorney for the District of New Jersey. In the Appointment Order, Attorney General Bondi approved delegations of authority to the triumvirate that included all of the divisions of the United States Attorney's Office for the District of New Jersey.[237] Moreover, the accompanying memorandum notes that the delegations "would divide the responsibilities *of the United States Attorney* among three officials," explicitly benchmarking the authority at issue to the full powers of the United States Attorney.[238] No powers are allocated elsewhere—to the contrary, the delegation to Ms. Fox includes a catchall delegation to supervise "any other matters arising within the district not specifically delegated herein."[239] So all of the

---

[236] *Seila Law*, 591 U.S. at 212 (citing *Bowsher*, 478 U.S. at 727 n.5).

[237] Naviwala Doc. 268-2 at 1 (delegating authority to "supervise or conduct the work of" the Criminal, Civil, Appellate, Special Prosecutions, and Administrative Divisions); Department of Justice, U.S. Attorneys, District of New Jersey, Divisions, https://www.justice.gov/usao-nj/divisions (last visited Mar. 5, 2026) (listing only these same five divisions).

[238] Naviwala Doc. 268-2 at 2; *see id.* at 4 ("The proposed Order would delegate the responsibilities of the office of United States Attorney for the District of New Jersey to three officials.").

[239] *Id.* at 1. In briefing, the Government has argued that, in the event one member of the triumvirate is disqualified, this catch-all would automatically reassign that individual's duties to Ms. Fox. Naviwala Doc. 284 at 35.

powers of the United States Attorney of the District of New Jersey have been delegated to the triumvirate.

The Government stated at oral argument that several *de minimis* powers of a United States Attorney have in practice been allocated outside of the triumvirate, implying that this makes a difference.[240] But that distribution is not required by the delegation, which grants complete supervisory authority over the District of New Jersey to the triumvirate, meaning that those powers can be handed back at any time.[241] In any event, in its supplemental briefing the Government appears to have walked its position back, noting only that "the Attorney General *may* amend her delegation order to expressly require that certain certifications or applications" must be performed by other officials.[242] Obviously, the fact that the Attorney General *could theoretically* structure the delegation differently is completely irrelevant to determining the scope of the delegation that is *actually in effect*. The fact that the Attorney General has not so structured the delegation confirms beyond doubt that the triumvirate has been delegated all of the powers of the United States Attorney. And, at bottom, transferring one or two minor powers cannot change the substance of the delegation which, in the Government's own terms, is specifically designed to

---

[240] Naviwala Doc. 302 at 6:14-25 (stating that "ex parte applications for tax information" are "being signed by a Senate-confirmed Assistant Attorney General").

[241] *See id.* at 28:5-24 (defendants noting that "[t]here is nothing in this delegation that says except for tax applications").

[242] Naviwala Doc. 310 at 7.

include "the responsibilities of the United States Attorney," and empowers the triumvirate to "exercise supervisory authority of essentially the work of the office."[243] The Government cannot have it both ways. In the Attorney General's formal delegation order and internal DOJ materials, she says that she has delegated the powers of the United States Attorney.[244] I hold her to her word.

### 3.    Source of Authority

Finally, I determine that the authority that has been delegated is in fact the United States Attorney's, and not the Attorney General's. Four factual considerations compel this conclusion. First, as just stated, the delegated powers are explicitly benchmarked to and match the powers of a United States Attorney. Second, in an Office of Legal Counsel "Action Memorandum" addressing and approving the appointment Order and bearing Attorney General Bondi's signature, Deputy Assistant Attorney General Lanora C. Pettit stated that "[t]he proposed Order would *delegate the responsibilities of the office of United States Attorney for the District of New Jersey* to three officials."[245] Third, the Government continues to fund the relevant litigation almost exclusively with funding appropriated to United States Attorneys—and not with funding appropriated to the Attorney General for her own

---

[243] *Id.* at 2; Naviwala Doc. 302 at 7:9-14; *Widakuswara v. Lake*, 2026 WL 638676, at *3, 7-8 (D.D.C. Mar. 7, 2026) (holding that exercise of "95 percent" of vacant office's duties is "*de facto* control" that is prohibited by FVRA).

[244] This factual finding resolves the Government's contention that it could delegate just the authority to conduct criminal matters in the District. Maybe it could. But it has not.

[245] Naviwala Doc. 268-2 at 4 (emphasis added).

litigation.[246] When Congress appropriates funding for a certain purpose, the Executive is not free to reassign it unless Congress has given it the power to do so.[247] And Congress has not given such unilateral power here (even if it had, the Government does not claim to have transferred the money to the proper account).[248] Instead, Congress provided an appropriation for the "General Legal Activities" of the DOJ, and separate funding to the "United States Attorneys" for their litigation.[249] By funding the office using money appropriated to United States Attorneys, the Government therefore clearly indicates that the office continues to operate under the authority of a United States Attorney.[250] And, fourth, I have concluded that the

---

[246] Naviwala Doc. 304-1. The only exceptions are special cases when different funding would be available for distribution to a properly organized United States Attorney's office.

[247] *Office of Personnel Management v. Richmond*, 496 U.S. 414, 425 (1990); *United States v. MacCollom*, 426 U.S. 317, 321 (1976).

[248] Consolidated Appropriations Act of 2024, Pub. L. No. 117-42, § 6, div. C, tit. V, § 505, 138 Stat. 25, 167 (2024) (prohibiting unilateral reprogramming of funds which "relocates an office or employees" or "reorganizes or renames offices, programs, or activities").

[249] *See* Consolidated Appropriations Act of 2024, Pub. L. No. 117-42, § 6, div. C, tit. II, 138 Stat. 25, 134-35 (2024) (providing funding for "General Legal Activities" within the Department of Justice, and distinguishing such funding from appropriations for "Salaries and Expenses, United States Attorneys"), as extended in the Continuing Appropriations Act of 2025, Pub. L. No. 118-83, § 3, div. A, 138 Stat. 1524, 1525 (2024), the Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4, § 3, div. A, tit. I, § 1101(a)(2), 139 Stat. 9, 10-11, (2025), the Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act of 2026, Pub. L. No. 119-37, § 5, div. A, § 101, 139 Stat. 495, 496 (2025), and the Commerce, Justice, Science; Energy and Water Development; and Interior and Environment Appropriations Act of 2026, Pub. L. No. 119-74 (2026) (see H.R. 6938, § 5, div. A, tit. II (enacted Jan. 23, 2026)).

[250] *Compare* Letter from Assistant Attorney General for Administration Jolene Ann Lauria, U.S. Dep't of Justice, to Congressman Hal Rogers, U.S. H.R. (Jan. 16, 2026) (providing notice under section 505 of the appropriations acts that DOJ is undertaking a reorganization within the Department of Justice to create a National Fraud Enforcement Division).

Government's explicit motivation for making these personnel moves and delegations is to unilaterally fill the Office of the United States Attorney.[251]

Even more tellingly, on the Government's side of this coin is nothing but *ipse dixit*. Nothing in the text of the actual appointment order or any of its supporting materials indicates that the Attorney General's own powers are being delegated. All indications point toward the United States Attorney. Maybe that it why the Government spends more time in the briefing describing the statutory authority and language that the Appointment Order *does not* use than that which it does.[252] The Government may not amend the record through briefing.[253] That the DOJ decisionmakers appear to have rushed into making these appointments without first considering the legal strategy is a rookie mistake attributable to no one but them.

The Government may protest that this analysis takes an overly formalistic view of its actions. But its own argument compels this approach. In its briefing, the Government rests nearly all on its position that there is a significant and critical difference between the powers of the United States Attorney and those of the Attorney General. Yet its own internal descriptions of its conduct clearly indicate that it is not meticulously adhering to its own distinction. Instead, the facts show that

---

[251] *Supra* at 8-12.

[252] *See* Naviwala Doc. 284 at 6 (citing no statutes and one phrase of the Appointment Order); Naviwala Doc. 310 at 2-3 (listing eight statutes not expressly cited in the Appointment Order).

[253] *Coinbase, Inc. v. Sec's & Exch. Comm'n*, 126 F.4th 175, 200 (3d Cir. 2025) ("[W]e look only to what the agency said at the time of the action—not to its lawyers' post-hoc rationalizations." (quoting *Good Fortune Shipping SA v. Comm'nr of IRS*, 897 F.3d 256, 263 (D.C. Cir. 2018))).

the Government itself believes that the instant delegation confers the powers of the United States Attorney, or at the very least believes that the distinction it identifies is insignificant in practice. Again, the Government may not have its cake and eat it too. If it wants to take the position that it has delegated only the powers of the Attorney General, it must support that position with evidence. It has not done so here.

I am not fooled by the Government's superficial arguments. The triumvirate is *not* exercising a distinct delegation of the Attorney General's authority to oversee litigation. That assertion is nothing more than a rhetorical smokescreen, invented to serve this litigation, and carrying absolutely no functional effect. So here, as before, the Attorney General has delegated the authority of the United States Attorney through the vesting provision of 28 U.S.C. § 509 and the delegation provision of 28 U.S.C. § 510,[254] thereby creating a *de facto* United States Attorney.[255]

### D.    Substantive Analysis

#### 1.    FVRA

In *Giraud*, I held, and the Third Circuit affirmed, that Ms. Habba had been delegated all of the functions and duties of the United States Attorney for the District

---

[254] Indeed, the delegation Order gives the game away by citing *only* section 509 and 510 as the source of the delegation, although this point is not immediately dispositive because the relevant language is nonexhaustive. Naviwala Doc. 268-2 at 1 ("By virtue of the authority vested in the Attorney General by law, *including* 28 U.S.C. § [sic] 509 and 510." (emphasis added)); Naviwala Doc. 310 at 2-3 (arguing that "including" ropes in at least eight other statutes).

[255] *Giraud*, 160 F.4th at 403.

of New Jersey, and that such a delegation violated the FVRA's exclusivity provision. According to the Government, the FVRA is limited to that specific situation: it prohibits only a delegation of all the functions and duties of the vacant office to a single person. That is incorrect. Under the FVRA, the delegation in this case is not different from *Giraud* (as the Government previously argued),[256] and it therefore fails for the same reason.

"Th[is] question[] require[s] [me] to interpret the FVRA, and '[I] will start where we always do: with the text.'"[257] The Court views the statutory text in context, both with regard to "the specific context in which the language is used, and the broader context of the statute as a whole."[258] Ultimately, the task is to "give effect, if possible, to every clause and word of the statute."[259]

Section 3347(a) of the FVRA (the "exclusivity provision") states that "[s]ections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [PAS] office of an Executive agency."[260] This provision therefore prohibits the use of any method of authorizing a person[261] to "temporarily perform the functions and duties of any

---

[256] *Giraud*, 160 F.4th at 406 ("'It is not evident . . . why that distinction would be material.'" (quoting Government's appellate brief)).

[257] *Giraud*, 160 F.4th at 397 (quoting *Al-Hasani v. Sec'y United States Dep't of Homeland Sec.*, 81 F.4th 291, 296 (3d Cir. 2023)).

[258] *Id.* (quoting *Hayes v. Harvey*, 903 F.3d 32, 41 (3d Cir. 2018)).

[259] *Id.* (quoting *Fischer v. United States*, 603 U.S. 480, 486 (2024)).

[260] 5 U.S.C. § 3347(a).

[261] In *Giraud*, the Court of Appeals rejected the Government's argument that section 3347 can be avoided by authorizing a person to perform the functions and duties of a vacant office without

[PAS] office" that is not the FVRA or a position-specific statute. And subsection (b) specifies that "[a]ny statutory provision providing general authority to the head of an Executive agency . . . to delegate duties statutorily vested in that agency head to, or to reassign duties among, officers or employees of such Executive agency, is not a statutory provision to which subsection (a)(1) applies."[262] Section 3347(b) acts as a clarifier, making doubly sure that general delegation and reassignment statutes are not mistakenly considered exceptions to the FVRA's exclusivity rule.[263] Based on this text, neither of the Government's distinctions—dividing the authority or changing its source—brings its actions outside of the FVRA.

At the outset, the Government advances no analysis or argument to show that the current delegation escapes the plain terms of the exclusivity provision of section 3347(a). It does not (and cannot) contend that this delegation is being made pursuant to sections 3345 or 3346, nor does it assert that it is using a position-specific statute.[264] Thus, this delegation violates the exclusivity provision on its face.

---

assigning them the title of "Acting" official. *See Giraud*, 160 F.4th at 404 ("The statutory language indicates that an acting official is one who performs the functions and duties of an office.").

[262] 5 U.S.C. § 3347(b). Section 3347(a)(1) excepts from the exclusivity provision statutory provisions that expressly permit a different temporary assignment of duties with regard to the "specified office," either by "the President, a court, or the head of an Executive department," or by the statute's own terms. Such provisions are generally called "position-specific" statutes. *See Giraud*, 795 F. Supp. 3d at 597.

[263] *Giraud*, 795 F. Supp. 3d at 595 (noting that section 3347(b) "clarif[ies] the scope of" 3347(a)(1)).

[264] *See* 5 U.S.C. § 3347(a)(1); *United States v. Garcia*, 2025 WL 2784640, at *13 (D. Nev. Sept. 30, 2025) (reasoning that delegation argument failed because delegation statutes did not meet section 3347(a)(1)'s exception to exclusivity).

Next, the Government's division of authority argument makes no difference statutorily. It contends that the phrase "an acting official," as used in the statute, indicates that the exclusivity provision is concerned with delegating power to a single actor. The Government seizes on the use of the singular article and noun to contend that the provision does not apply to delegations to multiple actors.[265] But "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things."[266] The Government contends that here, context does indicate otherwise, but the sole context it describes is the Courts' decision in *Giraud* to focus on whether the provision applied in a case where all of the functions and duties of the vacant office were vested in a single individual.[267] The Third Circuit and I both made clear that that distinction was purely designed to limit our decisions to the facts presented in the case, and both Courts carefully refused to offer any opinion on the Government's current approach.[268]

---

[265] *See* Naviwala Doc. 284 at 15.

[266] 1 U.S.C. § 1; *see In re Kaiser Aluminum Corp.*, 456 F.3d 328, 337 (3d Cir. 2006).

[267] Naviwala Doc. 284 at 13-15.

[268] *Giraud*, 160 F.4th at 406 ("[I]t is *possible* a more dispersed delegation of authority *might* not create a *de facto* U.S. Attorney and therefore *might* not run afoul of the FVRA's exclusivity provision—though *we do not decide that today because those are not the facts of this case*." (emphasis added)); *Giraud*, 795 F. Supp. 3d at 600 n.257 ("*I do not express any opinion* on the possibility of parceling out these duties to separate individuals or delegating only a clearly limited subset of nonexclusive and delegable duties." (emphasis added)).

The explicit refusal to consider an issue is not support for any reading of a statute, and certainly does not provide "context" that would shade the statutory language in either direction.

In reality, no context indicates that "an acting official" cannot refer to several individuals working in concert. As I described in *Giraud*, whether a person is serving as an "acting official" under the FVRA depends not on any title or formal designation, but instead on whether she is performing the functions and duties of the office.[269] And, as my earlier discussion makes clear, the terms "office" and "official" are merely labels with which to describe a specific set of functions and duties.[270] So the question turns solely on the performance of the functions and duties of the vacant office, not on who is performing them. Here, as I found *supra*, the triumvirate's members are together exercising the functions and duties of the Office of the United States Attorney, so they are, collectively, serving as an "acting official."

Additional precedent supports the conclusion that there is no distinction between singular or plural officeholders. The Supreme Court has held that a multi-member body can be the "Head" of a Department when the members collectively hold sufficient authority.[271] Statutory provisions similarly recognize that "a collegial

---

[269] *Giraud*, 795 F. Supp. 3d at 597 ("[O]ne who is 'performing the functions and duties of the office temporarily' is doing so 'in an acting capacity.'").

[270] *See supra* at 31-32; *Gomez*, 490 U.S. at 864 ("When a statute creates an office to which it assigns specific duties, those duties outline the attributes of the office.").

[271] *Free Enter. Fund*, 561 U.S. at 512-13; *Dep't of Transp. v. Assoc. of Am. R.Rs.*, 575 U.S. 43, 65 (2015) (Alito, J., concurring) ("[A] multimember body may head an agency . . . . [B]ecause

body composed of two or more individual members" can "head" an "agency."[272]

This law reinforces the conclusion that the Court should focus on whether the vacant

office's functions and duties are being exercised, and not by how many people.

Accordingly, the division of authority does not escape the FVRA's exclusivity

provision.

Nor can the Government get around the exclusivity provision by recasting the

delegation as one of the Attorney General's own powers, rather than the powers of

the vacant position, for several reasons. First, as I have noted *supra*, the facts do not

support the Government's assertion.

Second, even if the Attorney General were effectively delegating her own

powers, the FVRA would still prohibit the delegation. Section 3347(b) identifies two

types of the department head's power, and states that neither can be used as an

exception to the FVRA's exclusivity rule. The first is "[a]ny statutory provision

providing general authority to the head of an Executive agency . . . to delegate duties

statutorily vested in that agency head to . . . officers or employees of such Executive

agency."[273] In *Giraud*, the Courts focused on the combination of two statutes to

conclude that this provision applied: 28 U.S.C. § 509, which "vest[s] in the Attorney

General" "[a]ll functions of other officers of the Department of Justice and all

---

agency heads must be principal officers, every member of a multimember body heading an
agency must also be a principal officer.").
[272] 5 U.S.C. § 552b(a)(1) (open meetings law).
[273] 5 U.S.C. § 3347(b).

functions of agencies and employees of the Department of Justice," and 28 U.S.C. § 510, which authorizes the Attorney General to "authoriz[e] the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."[274] That focus was due to the Government's position that the United States Attorney's functions and duties were vested in the Attorney General through section 509, and therefore could be redelegated in a package under section 510.

Here, the Government's argument is slightly different (although it curiously continues to cite section 509). It primarily focuses on the Attorney General's original powers, including to "direct[]" "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested,"[275] to "personally conduct and argue any case in a court of the United States in which the United States is interested, or . . . direct the Solicitor General or any officer of the Department of Justice to do so,"[276] and to "supervise all litigation to which the United States, an agency, or officer thereof is a party, and . . . direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties."[277] These powers are undoubtedly broad and permit the Attorney General to exercise near absolute

---

[274] *See Giraud*, 160 F.4th 404-05.
[275] 28 U.S.C. § 516.
[276] 28 U.S.C. § 518(b).
[277] 28 U.S.C. § 519.

supervisory authority over litigation in the Department of Justice. But *not when there is a vacancy* in the relevant chain of authority.[278]

Instead, section 3347(b) anti-delegation clause covers all of these provisions. On the Government's own argument, the delegations in this case—all of them—stem from the "general" delegation authority established in section 510.[279] And each of the Attorney General's powers that the Government cites are no less "statutorily vested" in the Attorney General because they are given to her directly than if they were vested through the broad action of section 509. "Vest" means simply "to grant or endow with a particular authority, right, or property."[280] There can be no dispute that statutorily authorizing the Attorney General to exercise certain powers "vests" those powers that office. So, whether vested in her through section 509, 515, 516, 517, 518, or 519, she may not delegate those powers to permit anyone to perform the functions and duties of a vacant PAS office.

The second type of power that cannot be used to fill a vacant PAS office is the Department Head's authority to "reassign duties among[] officers or

---

[278] *See* Brief of Amicus Curiae Cato Institute in Support of Defendants/Appellees/Cross-Appellants at 18 n.5, *United States v. Jackson*, No. 25-6214 (9th Cir. Nov. 28, 2025), Doc. 28 ("Congress in the FVRA made the clear judgment that it is not anomalous to reduce an agency's delegation authorities during a vacancy, because doing so is the only way to ensure that the limitations of the Vacancies Act are followed.").

[279] *See, e.g.*, Naviwala Doc. 284 at 14.

[280] Vest, *Merriam-Webster's Deluxe Dictionary* (10th coll. ed. 1998); Vest, *New Oxford Dictionary of English* (1st ed. 1998) ("confer or bestow (power, authority, property, etc.) on someone . . . the legal right to power, property, etc."); *see* Vest, *Black's Law Dictionary* (7th ed. 1998) ("To confer ownership of (property) upon a person").

employees."[281] This prohibition reinforces the prior analysis by prohibiting the Attorney General from using her power to restructure the Department of Justice to fill vacant PAS offices. Not only does this clause redundantly prohibit the delegations of the Attorney General's own powers, which function no differently than a "reassignment" of the Attorney General's duties, but it also indicates that the Attorney General may not horizontally move authorities between similarly situated officers once an office is vacant.

By way of example, Congress by statute has provided for 11 Assistant Attorneys General ("AAGs"), who are all subject to the PAS rule.[282] The AAGs' only statutory duty is to "assist the Attorney General in the performance of [her] duties."[283] By regulation, the Attorney General has assigned various AAGs specific duties which do not overlap. For instance, the AAG overseeing the Office of Legislative and Intergovernmental Affairs handles different issues than those assigned to the AAG who manages the Office of Legal Counsel.[284]

The FVRA's anti-reassignment provision explains that the Attorney General may not use her power to assign the AAGs' duties to fill a vacancy in one AAG position by reassigning that AAG's duties to a different, filled AAG position. The

---

[281] 5 U.S.C. § 3347(b).
[282] 28 U.S.C. § 506.
[283] *Id.*
[284] *Compare* 28 C.F.R. § 0.27 ("General Functions" of AAG, Office of Legislative and Intergovernmental Affairs) *and* 28 C.F.R. § 0.25 ("General Functions" of AAG, Office of Legal Counsel); *see also, e.g.*, 28 C.F.R. § 0.23 (AAG, Office of Legal Policy); 28 C.F.R. § 0.40 (AAG, Antitrust Division).

Department Head cannot reassign her own powers to other officials, nor one official's power to another, in order to authorize the performance of the functions and duties of the vacant office.[285]

Next, the Government again repeatedly adverts to the idea that the triumvirate is only performing the "nonexclusive and delegable" duties of the Office of the United States Attorney, relying on section 3348 of the FVRA. The Government reads far too much into statutory silence. Section 3348 explains what happens with the nondelegable and exclusive duties of the vacant office:[286] they may continue to be performed by "only the Head of such Executive Agency,"[287] and if performed by anyone else those actions "shall have no force or effect" and "may not be ratified."[288] As to the "nonexclusive and delegable" duties of the vacant office, section 3348 is absolutely silent. It does not, as the Government seems to believe, say that those duties may legally be performed by anyone. It simply does not address such duties at all. And to the extent that any intent can be gleaned from Congress's choice to exclude the broader nonexclusive and delegable functions and duties of the office from section 3348,[289] the Court cannot infer that Congress intended to fully permit their performance by anyone with no consequence all, given that the statute

---

[285] 5 U.S.C. § 3347(b).

[286] *See* 5 U.S.C. § 3348(a)(2) (defining "function or duty" "in this section").

[287] 5 U.S.C. § 3348(b)(2).

[288] 5 U.S.C. §§ 3348(d)(1), (d)(2).

[289] *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

establishes consequences of *heightened* severity for improper performance of the exclusive and nondelegable functions.[290] The most charitable reading of section 3348 is that its extreme consequence does not apply to the nonexclusive and delegable duties of the vacant office, so they are not immediately without "force or effect" and "may . . . be ratified" even if not performed by the "head of [the Executive] agency."[291]

Thus, as I explained in *Giraud*, the FVRA does not *authorize* anyone to perform the functions and duties of a vacant office unless they do so in compliance with its provisions.[292] But, in terms of the *consequences* for a violation, the FVRA "creates a two-tiered system for handling the functions and duties . . . of the [vacant] office during the vacancy."[293] The exclusive and nondelegable duties are subject to section 3348's heightened performance requirement and penalty. The nonexclusive and delegable duties are subject to the normal rules of *ultra vires* action, meaning that they are voidable but may be ratified.[294] And, based on this scheme, as addressed

---

[290] *See SW Gen.*, 580 U.S. at 298 n.2 ("The FVRA exempts 'the General Counsel of the National Labor Relations Board' from the general rule that actions taken in violation of the FVRA are void *ab initio*. 5 U.S.C. § 3348(e)(1). The Court of Appeals 'assume[d] that section 3348(e)(1) renders the actions of an improperly serving Acting General Counsel voidable.'").

[291] 5 U.S.C. §§ 3348(b)-(d)(2).

[292] *See Giraud*, 795 F. Supp. 3d at 600 ("[O]nce FVRA and position-specific temporary appointments statutes have been exhausted, no one may hold the vacant office in *any* capacity."); 5 U.S.C. § 3347.

[293] *Giraud*, 795 F. Supp. 3d at 600.

[294] *Kajmowicz*, 42 F.4th at 151-52 (reasoning that the consequence of section 3348 is that "under the Vacancies Reform Act, officials could no longer ratify all actions, only those that rested on exercises of delegable authority"); *Gonzales & Gonzales*, 107 F.4th at 1077 ("even where functions and duties performed in violation of the FVRA fall outside of the scope of § 3348, those actions are '*voidable*, not void.'" (emphasis in original)); *Id.* ("Violations of the FVRA

in both *Giraud* opinions, section 3348 is largely beside the point for a preratification challenge, because without ratification, any actions not in conformance with the FVRA can be declared void.[295]

The existence of ratification cases under the FVRA supports this reading.[296] In *Kajmowicz v. Whitaker* and *Gonzales & Gonzales Bonds & Insurance Agency, Inc. v. United States Department of Homeland Security*, the Third and Ninth Circuits confronted challenges to improperly appointed acting officers.[297] Both Courts of Appeals found that the actions those officers had taken were not subject to the heightened consequences of section 3348.[298] Yet neither Court held that, as a result, the actions were automatically valid. Instead, the Courts relied on the ratification of those actions by a subsequent, properly appointed official to uphold the action.[299] The focus on ratification confirms that functions and duties not covered by section 3348 (i.e., nonexclusive and delegable) but nevertheless performed in violation of the FVRA are *voidable*, not automatically valid nor immediately and forever void.[300]

---

that are not void under § 3348(d) remain voidable on other grounds, subject to applicable defenses.").

[295] *Giraud*, 160 F.4th at 404-05 (finding that discussion of section 3348 in *Kajmowicz*, 42 F.4th 138 was "inapplicable"); *Giraud*, 795 F. Supp. 3d at 601.

[296] *See Giraud*, 795 F. Supp. 3d at 601 n.263.

[297] *Kajmowicz*, 42 F.4th 138; *Gonzales & Gonzales*, 107 F.4th at 1069-70.

[298] *Kajmowicz*, 42 F.4th at 148-52; *Gonzales & Gonzales*, 107 F.4th at 1073-80.

[299] *Kajmowicz*, 42 F.4th at 152; *Gonzales & Gonzales*, 107 F.4th at 1080.

[300] *See SW Gen., Inc. v. Nat'l Labor Rels. Bd.*, 796 F.3d 67, 79 (D.C. Cir. 2015) (assuming without deciding that "actions of an improperly serving Acting General Counsel" that are exempt from the "void-ab-initio and no-ratification rules" of section 3348 are "*voidable,* not void"); *Gonzales & Gonzales*, 107 F.4th at 1077.

Moreover, although it did not explicitly pass on the question,[301] the Supreme Court's conclusion in *SW General* would be strange if the Government's reading of section 3348 were accurate. *SW General* concerned the actions of the "Acting" General Counsel of the National Labor Relations Board ("NLRB").[302] Section 3348 *explicitly does not apply* to that office.[303] Yet the Supreme Court, after interpreting a provision of section 3345, concluded that the officer performing the functions and duties of that vacant office was not doing so in accordance with the FVRA, and declared his actions void.[304] That outcome also supports the Court's reading of the FVRA.[305]

Finally, the Government's resort to the FVRA's legislative history does not help it here. It cites language in the FVRA's Senate Report indicating that "delegable functions of the [vacant] office could still be performed by other officers or employees" outside of acting service that comports with the FVRA.[306] I have already interpreted the text of the statute extensively and found that it unambiguously

---

[301]  *See SW Gen.*, 580 at 298 n.2.
[302]  *SW Gen.*, 580 U.S. at 297.
[303]  5 U.S.C. § 3348(e)(1).
[304]  *SW Gen.*, 580 U.S. at 299-308, 309.
[305]  *Accord Gonzales & Gonzales*, 107 F.4th at 1080 n.9.
[306]  Naviwala Doc. 310 at 8 (citing S. Rep. No. 105-250 at 18, 31, 36).

forecloses the Government's argument,[307] but to the extent that it is useful,[308] the legislative history does not conflict with my reading of the statute. I agree that delegable functions of the vacant office *can* still be performed by other officers, but those actions *must be ratified* by a validly appointed officer with sufficient authority to have continued effect. Notably, in the event that delegable actions go unchallenged, as is likely to be the case for any actions that do not directly impact third parties, there is no real threat that those actions will ever be declared void. And, if the Executive genuinely endeavors to fill the office legally, periods of improper acting service should be extremely short, meaning that challengers will rarely, if ever, have sufficient time to fully litigate a challenged action before it can be ratified.[309]

Moreover, while some parts of the Senate Report are relatively clear, the sections dealing with section 3348 are particularly muddled and at times do not comport with the statutory text. For example, the Senate Report claims that "the successor in the office by virtue of his appointment by the President by and with the

---

[307] *Mohamed v. Palestinian Auth.*, 566 U.S. 449, 458-59 (2012); *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 698 (3d Cir. 2016) ("[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material,' as legislative history can be 'murky, ambiguous, and contradictory.'" (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005))).

[308] *See Giraud*, 795 F. Supp. 3d at 589-90 (citing S. Rep. 105-250 to confirm interpretation of statutory text).

[309] *See* S. Rep. 105-250 at 19 ("Any inconvenience to the executive branch can be eliminated instantly by the President's unilateral decision to make a nomination."); *id.* at 5 ("The [P]resident's duty is to submit nominees for offices to the Senate, not to fill those offices himself."); *cf. Kajmowicz*, 42 F.4th at 145-46.

advice and the consent of the Senate may not ratify the actions of a person who filled the office in violation of the legislation's provisions or who, not being the agency head, performed nondelegable duties of the office."[310] Yet cases have repeatedly interpreted section 3348 to permit ratification in the first scenario.[311] The legislative history is not clear as to this issue, and in any event does not conflict with my interpretation of the text, which is consistent with existing case law.

Based on the foregoing analysis, I conclude that the triumvirate collectively is performing the functions and duties of the vacant office of the United States Attorney for the District of New Jersey in violation of the FVRA. Although many if not all of their actions are not *void ab initio*, all of their actions are at least voidable. Moreover, because their service does not comport with the FVRA, they can be disqualified from further action.[312]

## 2. Appointment and Delegation

Even if the FVRA does not bar the use of delegation to permit the performance of the functions and duties of a vacant PAS office, the statutory scheme structuring the DOJ does not permit the delegations at issue to the officers serving in the triumvirate. Accordingly, the triumvirate is improperly serving for this independently sufficient reason.

---

[310] S. Rep. 105-250 at 19.

[311] *See, e.g.*, *Kajmowicz*, 42 F.4th at 148-52; *Gonzales & Gonzales*, 107 F.4th at 1077-78; *cf. Hooks v. Kitsap Tenant Support Servs.*, 816 F.3d 550, 564 (9th Cir. 2016).

[312] *Giraud*, 160 F.4th at 406-07 (affirming disqualification for violation of FVRA).

The Government argues that the Office of the United States Attorney is redundant.[313] On its reading, the DOJ's "statutory framework authorizes the Attorney General, *wholly apart from the presence of any U.S. Attorney*, to exercise prosecutorial and supervisory authority in the District of New Jersey and to delegate those functions to others within the Department."[314] The problem with that reading is that, despite what the President may want, "Congress [has not] entirely abolish[ed] the office of U.S. Attorney."[315] The DOJ statutes must be interpreted in context, which includes the continued presence of a statute creating the office of the United States Attorney and subjecting it to the PAS rule.[316] Because Congress has retained that office, and the limitations attached to it, other, more general provisions cannot reasonably be interpreted to provide the means to subsume it.

The Government reasons that the individuals serving in the triumvirate were lawfully appointed to offices created by Congress,[317] and were then permissibly delegated the powers that they now wield.[318] Based on my factual finding that they are collectively exercising the powers of a United States Attorney,[319] I consider whether delegating *that* authority to any officer appointed under the same statutes as

---

[313] Naviwala Doc. 284 at 13 ("[E]ven if there is *no* United States Attorney—confirmed, interim, acting, or otherwise—the Attorney General may specifically direct DOJ attorneys to conduct the work of a USAO and supervise how they do so."); *id.* at 18.

[314] *Id.* at 12-13.

[315] *Id.* at 19.

[316] 28 U.S.C. § 541; *see also* 28 U.S.C. § 546.

[317] Naviwala Doc. 284 at 16-17.

[318] *Id.* at 19.

[319] *See supra* at 47-57.

the triumvirate is permissible. I do not accept the Government's contention that it is operating pursuant to a fully distinct line of authority stemming solely from the Attorney General.[320] Accordingly, I recap at the conclusion why that argument is not supported by the record and explain that it only raises additional questions.

### a.    The Triumvirate's Authority

Before jumping in, recall the Constitutional ground rules.[321] The Constitution gives Congress the exclusive power to create offices and to determine how those offices can be filled. Offices are defined by their functions and duties. So statutory provisions will explain the scope of the office's powers. And because the office-creating power is exclusive, the Executive may not alter the powers of an office unless Congress has explicitly authorized it to do so, and then only as far as Congress has expressly permitted in conformity with the Appointments Clause (for example, Congress could not permit the delegation of full principal-officer-level powers to an inferior officer who was appointed by the Department Head; to do so would result in a Department-Head-appointed principal officer, which would violate the Appointments Clause).[322] Otherwise, the Executive has unilaterally created a new office and filled it, which is Constitutionally intolerable.

---

[320] *See generally* Naviwala Doc. 284 at 17-21.

[321] *See supra* at 26-35.

[322] *Weiss*, 510 U.S. at 187-88 (Souter, J., concurring) ("Congress, for example, may not authorize the appointment of a principal officer without Senate confirmation; nor may the President allow Congress or a lower level Executive Branch official to select a principal officer."). This does not apply to statutorily empowered Acting officers, which are a distinct class of inferior

These propositions guide the analysis. First, I must determine whether Congress has statutorily created offices to support the appointments at issue, both in terms of the existence of the office at all and the powers that the relevant officer can wield. I find that precedent compels a finding that the identified offices have been created by Congress, but that none of them includes all of the powers that the Attorney General has assigned to the triumvirate. Second, because the offices have not been granted the relevant functions and duties in the first place, I must determine whether Congress has authorized the assignment of such authority to the relevant officers by delegation,[323] and whether that authorization comports with the Appointments Clause. Here, Congress has not authorized delegation of this subset of authorities.

### i.    Offices, Appointments, and Powers

The Government cites a number of statutes that it contends create offices within the Department of Justice. It notes that statutes establish the offices of the Deputy Attorney General, Associate Attorney General, Solicitor General, the Assistant Attorneys General, and the United States Attorneys.[324] All of these offices except that of the Assistant Attorney General for Administration are subject to the

---

officers under Supreme Court precedent. *See Edmond v. United States*, 520 U.S. 651, 661 (1997) (citing *United States v. Eaton*, 169 U.S. 331, 343 (1997)).

[323] *See Weiss*, 510 U.S. at 172 ("Congress repeatedly and consistently distinguished between an office that would require a separate appointment and a position or duty to which one could be 'assigned' or 'detailed' by a superior officer.").

[324] Naviwala Doc. 284 at 4 (citing 28 U.S.C. §§ 504, 504a, 505, 506-507A, 541).

PAS rule,[325] and the Government does not contend that any triumvirate member holds any of these offices. Instead, the Government further cites statutes creating the offices of Assistant United States Attorneys, "special attorneys to assist United States Attorneys," and supposedly creating the offices of "special attorneys," "special assistants to the Attorney General," and "'officials' to 'detect and prosecute crimes against the United States.'"[326] The Government also purports to find authority for the Attorney General to create new offices and make appointments thereto through 28 U.S.C. § 510 and 5 U.S.C. § 3101.[327] The Government never clearly identifies which statutes from this latter group were used to appoint the triumvirate, so the Court will consider them all.

Sections 3101 and 510 do not create any offices nor do they permit the Attorney General to do so unilaterally. Sections 542 and 543 do create inferior offices to which the Attorney General can make appointments, but their statutory duties plainly cannot support the appointments in this case. And sections 533 and 515 do not clearly create offices on their text.

Nevertheless, based on precedent, the Court assumes for the purposes of this case that an inferior office is created by some combination of these provisions, and that the Attorney General is permitted to make appointments to that office. But even

---

[325] *See* 28 U.S.C. §§ 504, 504a, 505, 506, 507A, 541; *id.* § 507 (permitting appointment by the Attorney General, "with the approval of the President").

[326] Naviwala Doc. 284 at 4 (citing 28 U.S.C. §§ 515-19, 533(1), 542, 543).

[327] *Id.*; *see* Naviwala Doc. 302 at 48:17-49:10.

this amorphous office is not so capacious that it can bear the weight of an officer or specifically designated group of officers exercising the full powers of a United States Attorney in the absence of a properly appointed United States Attorney.

Preliminarily, it is worth noting that Congress knows how to vest the power to create and fill inferior offices in a Department Head.[328] The Secretary of Transportation is empowered to "*appoint* and fix the pay of *officers* and employees of the Department of Transportation and may prescribe their duties and powers."[329] The Securities and Exchange Commission is permitted to "*appoint* and fix the compensation of such *officers*, attorneys, economists, examiners, and other employees as may be necessary for carrying out its functions."[330] The Administrator of the Federal Aviation Administration is empowered to "to *appoint*, transfer, and fix the compensation of such *officers* and employees, including attorneys, as may be necessary to carry out the functions of the Administrator and the Administration."[331] Tellingly, no such obviously applicable statute exists with regard to the DOJ.

---

[328] *See Commw. of Pa., Dep't of Pub. Welfare v. U.S. Dep't of Health & Hum. Servs.*, 80 F.3d 796, 804-05 (3d Cir. 1996) (noting statute giving Secretary of Health and Human Services "carte blanche to appoint individuals to assist her in carrying out [Social Security] duties").

[329] 49 U.S.C. § 323(a) (emphasis added); *see Edmond*, 520 U.S. at 666.

[330] 5 U.S.C. § 4802; 15 U.S.C. § 78d(b)(1) (emphasis added).

[331] 49 U.S.C. § 106(l)(1) (emphasis added); *see also* 42 U.S.C. § 2000e-4 (a) (Equal Employment Opportunity Commission ("EEOC") Chairman may "*appoint* . . . such *officers*, agents, attorneys, administrative law judges, and employees as he deems necessary to assist [the EEOC] in the performance of its functions").

*Section 3101.* The Government cites 5 U.S.C. § 3101 only in passing, and for good reason.[332] That statute provides that "[e]ach Executive agency, . . . may employ such number of employees . . . as Congress may appropriate for from year to year."[333] This provision is a "general, government-wide 'housekeeping' statute[]."[334] Notably, "employee" is defined under the relevant title to include "an officer."[335] But the provision's vague use of the term "employ" is not sufficiently clear to establish a broad power to create and fill new inferior offices.

The same argument was rejected in *United States v. Janssen*, a court martial case before the United States Court of Appeals for the Armed Forces.[336] There, the Secretary of Defense appointed a civilian Air Force employee to serve as a military judge—an inferior office.[337] The Government cited section 3101 as the statutory basis for the Secretary's power to appoint.[338] The Court of Appeals disagreed, reasoning that section 3101 could not be read to confer broad power to appoint inferior officers when considered against the "statutory structure that Congress has enacted for the Department of Defense . . . [which] sets out in great detail the officials

---

[332] Naviwala Doc. 284 at 4; Naviwala Doc. 310 at 3-4.
[333] 5 U.S.C. § 3101.
[334] *United States v. Janssen*, 73 M.J. 221, 224 (C.A.A.F. 2014).
[335] 5 U.S.C. § 2105(a).
[336] 73 M.J. 221 (C.A.A.F. 2014).
[337] *Id.* at 222.
[338] *Id.* at 222, 224.

who make up the Office of the Secretary of Defense, and the procedures to be employed for their appointment."[339]

I agree with *Janssen*'s reasoning, and it applies equally to the DOJ, which similarly has a detailed statutory scheme creating inferior offices and providing for their appointment.[340] Moreover, if section 3101 does grant Department Heads the power to create inferior offices and fill them, it is incredibly hard to see why Congress spent so much time enumerating inferior offices in every Department across the Government and providing for methods of appointment, including by unambiguously granting what would be an identical general authority to a specific department within the very same Title of the Code.[341] Even more tellingly, despite the immense power that the Government's interpretation of section 3101 would confer, it does not appear that the DOJ (or seemingly any other Executive Department) has ever relied on it to appoint inferior officers. The provision is not cited as authority for the Code of Federal Regulations Part dealing with the "Organization of the Department of Justice."[342] In sum, section 3101, with its use of the term "employ"—not appoint—and cross-reference to the term "officers," is not sufficiently unambiguous to vest the enormous power of office-creation and

---

[339] *Id.* at 225. This reasoning is significant given the similarity of the Government's argument in *Janssen* to that adopted by the Supreme Court in *Edmond*, 520 U.S. 651.

[340] 28 U.S.C. §§ 503-507a; 541-543

[341] 5 U.S.C. § 4802(b) (Securities and Exchange Commission); *see Janssen*, 73 M.J. at 225.

[342] *See* 28 C.F.R. ch. I, part 0 (citing 5 U.S.C. § 301 (authorizing promulgation of regulations) and 28 U.S.C. §§ 509, 510, 515-19).

appointment under the Appointments Clause's clear statement rule when considered against the countless detailed office-creating statutes that fill the Code.

*Section 510*. Section 510 states that "[t]he Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."[343] Nothing in the text of this provision creates any office or appointment authority.[344] It refers only to "*other* officer[s], employee[s], or agenc[ies]," indicating that the Attorney General may delegate authorities to already existing officers appointed under some other authority.[345] Moreover, it is not appropriate to "infer appointment authority from a principal officer's authority to supervise an inferior officer."[346] So section 510 creates no offices and authorizes no appointments.

*Section 542*. Section 542 authorizes the Attorney General to "appoint one or more assistant United States attorneys in any district when the public interest so requires."[347] Clearly, this text both creates the office of "Assistant United States Attorney" ("AUSA") and authorizes the Department Head to appoint such officers,

---

[343] 28 U.S.C. § 510.

[344] *Id.*; *compare* 49 U.S.C. § 323(a).

[345] 28 U.S.C. § 510; *see United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 621-22 (D.D.C. 2018); *Trump*, 740 F. Supp. 3d at 1266 ("Section 510 merely gives the Attorney General flexibility to authorize *existing* DOJ officers, employees, or agencies to perform the functions of the Attorney General." (emphasis in original)); *Trump*, 603 U.S. at 648 (Thomas, J., concurring).

[346] *Kennedy*, 606 U.S. at 804-05 (Thomas, J., dissenting).

[347] 28 U.S.C. § 542(a).

in compliance with the Appointments Clause.[348] The statute lists no specific duties for such officers, but it is self-evident that their role is limited to "assist[ing] United States attorneys."[349] As such, an officer appointed under section 542 is subordinate to the United States Attorney in the district to which he is assigned, and must look to the United States Attorney "for authority to act."[350] Mr. Fontecchio was appointed under this statute.[351]

As an "assistant," an AUSA cannot be granted such authority that he eclipses, subsumes, or replaces the United States Attorney that is his direct statutory superior.[352] For then he is no longer "assisting." If an AUSA does not rely on the

---

[348] There can be no real dispute that AUSAs are inferior officers who are subject to the Excepting Clause, and no one makes any such argument.

[349] 28 U.S.C. § 542(a); *Nadler v. Mann*, 951 F.2d 301, 305 (11th Cir. 1992) ("An AUSA is appointed by the Attorney General to aid the United States Attorney in carrying out his duties.").

[350] *Assistant*, Black's Law Dictionary (4th rev. ed. 1968) ("Ordinarily refers to employee whose duties are to help his superior, to whom he must look for authority to act.").

[351] Naviwala Doc. 284 at 6 & n.3 (noting that Mr. Fontecchio is "Executive Assistant U.S. Attorney" and "has been an AUSA in the USAO-NJ since 2016"); Naviwala Doc. 302 at 98:1.

[352] When a United States Attorney fully delegates the authority of his own office to an AUSA, he has not created an invalid officer, because it is his *own authority* which empowers the AUSA. The AUSA is still fully reliant on the United States Attorney for authority and, in the absence of the delegating United States Attorney, the AUSA's delegated power is extinguished. *See Laurel Baye Healthcare of Lake Lanier, Inc. v. Nat'l Labor Relations Bd.*, 564 F.3d 469, 473 (D.C. Cir. 2009) ("[A]n agent's delegated authority terminates when the powers belonging to the entity that bestowed the authority are suspended. . . . An agent's delegated authority is also deemed to cease upon the resignation or termination of the delegating authority." (citing Restatement (Third) of Agency § 3.07(4) and 2 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 504 (2008)). *But see New Process Steel, L.P. v. Nat'l Lab. Rels. Bd.*, 560 U.S. 674, 684 n.4 (2010) (declining to decide application of rule to "prior delegations of authority to nongroup members"); *UC Health v. Nat'l Lab. Rels. Bd.*, 803 F.3d 669, 679-80 & n.4 (D.C. Cir. 2015) (reasoning that discussion in *Laurel Baye* did not apply to delegations to Regional Directors because "Regional Directors never . . . occupy the Board's role as a final decisionmaker" and noting that "any objection will always be considered by the Board, and it

---

United States Attorney for authority or is not otherwise subject to the United States Attorney's supervision, he is not acting as an assistant and has exceeded the powers of his statutory office.

*Section 543*. Section 543 authorizes the Attorney General to "appoint attorneys to assist United States attorneys when the public interest so requires."[353] Again, this text creates the office of "Special Assistant United States Attorney," and authorizes the Department Head to appoint such officers, again in compliance with the Appointments Clause.[354] Moreover, the powers of such an officer are the same as with section 542. Special Assistants are just as much subordinate to the United States Attorneys as AUSAs, and their powers must similarly be so limited. The Government expressly disavows reliance on this provision.[355]

*Section 533*. Section 533(1) empowers the Attorney General to "appoint officials . . . to detect and prosecute crimes against the United States," or to do several other tasks which do not apply here.[356] This text does not clearly create an "office," and persuasive case law indicates that the duties of such office, if one is created, are narrowly circumscribed.

---

is the Board's action—declining to grant review or granting review and upholding or reversing the Regional Director's decision—that finally commits the Board's imprimatur").

[353] 28 U.S.C. § 543(a).

[354] *See* 28 U.S.C. § 543 (title).

[355] Naviwala Doc. 302 at 48:21 ("I'm not relying on 543.").

[356] 28 U.S.C. § 533(1); *see id.* §§ 533(2)-(4) (officials to "assist in the protection of the person of the President," "assist in the protection of the person of the Attorney General," and "to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General.").

As a textual matter, section 533(1)'s use of the term "official," as opposed to "officer," is significant. As Judge Aileen Cannon has explained in detail, in the context of section 533(1), these "terms are not synonymous, nor can they be superficially substituted."[357] Instead, the term "official" "describe[s] a more general class of bureaucratic personnel" than the term "officer," which, as I have already noted, "emphasize[s] the elevated degree of authority, responsibility, and duty that inheres in the position."[358] Moreover, when dealing with Appointments, Congress generally knows how to provide for the appointment of "officers," and does so using language which tracks the Appointments Clause.[359] That it did not do so here at least raises serious questions about "whether an 'official' is equivalent to an 'officer' as used by the Constitution."[360]

Moreover, assuming that it does create an office, the context in which section 533(1) appears provides important guidance informing the scope of that office's duties. As Justice Thomas and others have noted, section 533 is not located in chapters of law pertaining to the Attorney General, United States Attorneys, or

---

[357] *Trump*, 740 F. Supp. 3d at 1278.

[358] *Id.*; *Al Bahlul*, 967 F.3d at 869 (reasoning that statutory use of "official" "extends beyond officers in the constitutional sense, [and] refer[s] broadly to government employees" and stands in "contrast, . . . [to] Congress['s] general[] use[] [of] the word 'officer' to refer to principal and inferior officers who must be appointed in accordance with the Appointments Clause" (citing *Steele v. United States*, 267 U.S. 505, 507 (1925))); *see supra* at 27-30.

[359] *See Concord Mgmt.*, 317 F. Supp. 3d at 619-20; 49 U.S.C. § 323(a).

[360] *Trump*, 603 U.S. at 649 (Thomas, J., concurring).

Independent Counsel.[361] Instead, it appears in a chapter concerning the Federal Bureau of Investigation ("FBI") and sits among provisions concerning the appointment of individuals with duties such as "detect[ing] . . . crimes," "assist[ing] . . . in the protection of . . . the President" or "the Attorney General," and "conduct[ing] . . . investigations."[362] Although the statute's location cannot change the plain meaning of the text, it can inform interpretations of that text.[363] Moreover, the doctrine of *noscitur a sociis* counsels that "a word is known by the company it keeps," and acts to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'"[364]

Applying these rules of interpretation, section 533(1) cannot reasonably be interpreted to create an office that exercises broad prosecutorial authority or extensive supervisory powers. It would undoubtedly be "curious . . . for Congress to hide the creation of an office" for powerful functionaries within the structure of Main Justice in a provision dealing with the FBI,[365] particularly when Congress was not shy about establishing offices for litigating personnel in far more apt places in the

---

[361] *See* 28 U.S.C. chs. 31, 35, 40; *see Trump*, 603 U.S. at 649; *Trump*, 740 F. Supp. 3d at 1282-83; *Concord Mgmt.*, 317 F. Supp. 3d at 620.

[362] 28 U.S.C. § 533.

[363] *See Concord Mgmt.*, 317 F. Supp. 3d at 620 (quoting *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008)).

[364] *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

[365] *Trump*, 603 U.S. at 649 (Thomas, J., concurring).

code.[366] Moreover, every other provision in section 533 concerns investigation of crimes or protection of officials, exactly the kind of law enforcement groundwork that lies in the heartland of the FBI's jurisdiction.[367] With this context in mind, if section 533(1) does create an office that can exercise some prosecutorial power, the text and context prohibit interpreting that office more broadly than as a line-level prosecutor with some form of direct tie to the FBI's investigative functions. Obviously, such an officer could not wield significant supervisory authority over Main Justice or USAO litigators, and certainly would not hold all of the powers of a United States Attorney.[368]

*Section 515*. The Government focuses most of its argument on section 515, contending that this provision creates the offices of "special attorney" and "special assistant to the Attorney General," vests the Attorney General with the authority to appoint such officers, and empowers these officers to do anything *and everything*

---

[366] *See* 28 U.S.C. §§ 503-507a (seven consecutive provisions creating supervisory officials in chapter referring to "The Attorney General"); 28 U.S.C. §§ 541-543 (three consecutive provisions creating litigating and supervisory officials in chapter referring to "United States Attorneys").

[367] 28 U.S.C. § 533.

[368] *See Trump*, 740 F. Supp. 3d at 1283 ("It would be odd indeed if lawmakers—in establishing an office with the prosecutorial might of a United States Attorney—made no such mention in the statute's heading. If Congress had intended to create such a powerful and significant office in Section 533, it would not have obscurely buried the lede and omitted any such reference from the statute's heading, or more importantly, from the text of the provision itself."); *Concord Mgmt.*, 317 F. Supp. 3d at 620 ("Section 533's placement suggests interpreting the provision within the narrower context of its surrounding provisions governing the FBI and its investigations, not as a broad grant of authority for the Attorney General to appoint inferior officers generally and a Special Counsel in particular.").

that a United States Attorney can.[369] Based on the text, context, and relevant case law, section 515 cannot bear appointments of such weight.

Section 515(a) provides that "[t]he Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought."[370] Section 515(b) states that "[e]ach attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall take the oath required by law."[371]

This text does not clearly create any new offices, nor does it obviously permit the Attorney General to make any appointments. In the same cases that analyzed section 533, the courts held that section 515 does neither of these things. In *United States v. Trump*, Judge Cannon concluded that section 515(a) "is a provision conferring territorial flexibility to the Attorney General; it permits the Attorney General to use DOJ officers and previously appointed special attorneys to litigate on

---

[369] *See* Naviwala Doc. 284 at 4.
[370] 28 U.S.C. § 515(a).
[371] 28 U.S.C. § 515(b).

behalf of the United States, regardless of residence," but no more, and that "Section 515(b), read plainly, is a logistics-oriented statute that gives technical and procedural content to the position of already-'*retained*' 'special attorneys' or 'special assistants' within DOJ."[372] Similarly, in *United States v. Concord Management & Consulting, LLC*, the Honorable Dabney Friedrich concluded that "[o]n its face, § 515 does not explicitly empower the Acting Attorney General to appoint or retain anyone."[373] Instead, the text of the provision "require[s] some other law or authority—outside of § 515—to authorize the Acting Attorney General to make the special appointment" before it can be used to direct the litigation of those separately appointed officers.[374] Justice Thomas has also doubted that section 515 confers appointment power for the same reasons.[375]

These textual analyses are convincing. Were I writing on a blank slate, or even one with significant ambiguity, I would likely hold that section 515 does not create any offices nor empower the Attorney General to make appointments. But, as the Government points out, despite the fact that "the statutes 'do not explicitly authorize'" appointments, courts, including the Supreme Court, have interpreted the spread of DOJ legislation, with section 515 at its center, as permitting the Attorney

---

[372] 740 F. Supp. 3d at 1267-68 (emphasis in original); *see id.* at 1267-76 (interpreting statute at length).

[373] 317 F. Supp. 3d at 621.

[374] *Id.* at 621.

[375] *Trump*, 603 U.S. at 648 (Thomas, J., concurring) ("Section 515 contemplates an 'attorney specially appointed by the Attorney General *under law*,' thereby suggesting that such an attorney's office must have already been created by some other law.").

General to "appoint subordinate officers to assist him in the discharge of his duties."[376] I do not find this answer satisfying, particularly in light of my support for a clear statement rule for Appointments Clause legislation.[377] But, given the structure of the modern DOJ and the Government's inability to identify explicit statutory authority permitting the Attorney General to appoint *any* non-PAS inferior officers other than AUSAs and SAUSAs, I decline to pull on these threads when doing so is unnecessary to resolve this case. So I assume that the Attorney General has authority to appoint inferior officers under a section 515-centric array of statutes.

The inherent powers of this amorphous office are, according to the Government, primarily defined by section 515.[378] But the text of section 515, read in context, indicates that it cannot include all of the powers of a United States Attorney. The Government's authority does not contradict this reading, and instead expressly

---

[376] *United States v. Nixon*, 418 U.S. 683, 694 (1974) (citing 28 U.S.C. §§ 509, 510, 515, 533); *In re Sealed Case*, 829 F.2d 50, 55-57 (D.C. Cir. 1987) (citing 5 U.S.C. § 301, 28 U.S.C. §§ 509, 510, 515); *In re Grand Jury Investigation*, 916 F.3d 1047, 1052-54 (D.C. Cir. 2019); *Concord Mgmt.*, 317 F. Supp. 3d at 622-23 (finding *Nixon* and *Sealed Case* binding authority despite performing conflicting analysis of the relevant statutes); *see United States v. Biden*, 729 F. Supp. 3d 445 (D. Del. 2024) (describing appointment pursuant to 28 U.S.C. §§ 509, 510, 515); *United States v. Stone*, 394 F. Supp. 3d 1, 7 (D.D.C. 2019) (same). *Contra Trump*, 740 F. Supp. 3d at 1283-93 (holding relevant discussion in *Nixon* was dicta and rejecting cases relying on it).

[377] *Cf. In re Grand Jury Investigation*, 916 F.3d at 1054 (declining to conduct closer analysis because "clear statement" argument was forfeited).

[378] *See generally* Naviwala Doc. 284 at 24-26. Because it does not draw on any clear statutory authority, the Government continuously cites the full array of statutes to define the powers of this office. To the extent that section 510 defines this office's powers from the jump, my analysis in the following section makes clear that it does not support the appointments at issue in this case.

distinguishes exactly that level of delegation as deserving different treatment. Thus, the Government's cases support my reading of the statute.

Section 515 authorizes a person covered under the statute to, "when specifically directed by the Attorney general, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct."[379] Undoubtedly this language is broad and would appear to cover all of a United States Attorney's powers. But statutory context and precedent indicate these words cannot bear the broadest interpretation possible. Instead, other related statutory provisions provide limitations on the authority available under section 515(a).

The Government reads the word "any" in section 515(a) to mean "all."[380] That interpretation is generally fair. "Any" refers to "some; one out of many; [or] an indefinite number."[381] The term has "an expansive meaning,"[382] serving both as a "synonym for 'some'" and often "given the full force of 'every' or 'all.'"[383] But that

---

[379] 28 U.S.C. § 515(a).
[380] Naviwala Doc. 310 at 13.
[381] *Any*, Black's Law Dictionary (4th ed. 1968).
[382] *SAS Institute, Inc. v. Iancu*, 584 U.S. 357, 362-63 (2018) (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997))
[383] *Any*, Black's Law Dictionary (4th ed. 1968).

interpretation is not absolute: "'any' can and does mean different things depending upon the setting," such that reasonable limitations may sometimes be applied.[384]

The Supreme Court has, on several occasions, read "any" to mean less than all when context indicated that an expansive definition would produce "strange and indeterminate results" in areas of Constitutional significance.[385] In *Nixon v. Missouri Municipal League*, the Supreme Court read the statutory phrase "any entity" to mean only "any *private* entity" when a broader reading would have caused federal regulations to preempt state law.[386] The majority, and Justice Scalia joined by Justice Thomas in concurrence, reasoned that the term "any" was not sufficiently clear to satisfy the clear statement rule required for federal preemption, and thus must be read narrowly.[387] And in *Raygor v. Regents of University of Minnesota*, the Supreme Court found that the term "any" could not be given a maximalist reading when that interpretation would alter state sovereign immunity.[388] The Supreme Court again found that "any" did not pass the clear statement rule that applies to such issues.[389]

---

[384] *Nixon v. Mo. Mun. League*, 541 U.S. 125, 132 (2004); *Any*, Black's Law Dictionary (4th ed. 1968) ("Its generality may be restricted by the context.").

[385] *Nixon*, 541 U.S. at 132-38.

[386] *Id.* at 133.

[387] *Id.* at 140-41; *id.* at 141 (Scalia, J., concurring in the judgment) ("Section 253(a) simply does not provide the clear statement which would be required by *Gregory v. Ashcroft*, 501 U.S. 452 (1991), for a statute to limit the power of States to restrict the delivery of telecommunications services by their political subdivisions.").

[388] 534 U.S. 533, 542-43 (2002) (O'Connor, J., joined by Rehnquist, C.J., and Scalia, Kennedy, and Thomas, JJ.).

[389] *Id.* at 543.

So too here. As I have noted, precedent supports the application of a clear statement rule to statutes creating offices, assigning powers, and allocating appointment authority.[390] And, with that rule in mind, the context here strongly indicates that Congress cannot have meant "any" to mean "all" in section 515(a). "'Context' . . . means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional acts."[391] Moreover, it is a core consideration of statutory interpretation that "laws dealing with the same subject . . . should if possible be interpreted harmoniously."[392] To avoid conflicts, the Court should avoid interpretations that would render a provision surplusage,[393] favor more specific provisions over general ones,[394] and employ a reading, where possible, that furthers the document's apparent purpose.[395] The related statutes here are obvious: those that expressly deal with a United States Attorney and his powers.[396]

Take first the canon against surplusage. That rule teaches that "[i]f a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the

---

[390] *Supra* at 33-35.

[391] *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993).

[392] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012).

[393] *Id.* at 174.

[394] *Id.* at 183.

[395] *Id.* at 63.

[396] 28 U.S.C. §§ 541, 545, 546, 547.

latter should be preferred."[397] The canon "is strongest" when an interpretation of one statute would "render superfluous another part of the same statutory scheme."[398] The Government's reading of section 515(a) creates exactly this problem.[399] Reading "any" to mean "all" would make section 515 Special Attorneys fully equivalent to United States Attorneys, essentially creating two statutes that achieve identical results. The Government not only acknowledges this outcome, it embraces it.[400] That perverse reading should be resisted.

Moreover, the differences between appointing a section 515 Special Attorney with all the powers of a United States Attorney and a section 541 (or 546) United States Attorney lie only in the *limitations* on who can serve as the latter. Section 515 includes no prerequisites restricting who may be authorized to serve as a Special Attorney, and no time limits on that service.[401] In contrast, to be a United States Attorney, an individual must be PAS appointed and "reside in the district," and can only serve for a four-year term (with extensions).[402] Interim service in the role permits broader qualifications, but on a much stricter timeline of 120 days.[403] But the

---

[397] Scalia & Garner, *supra* note 392, at 176; *see Nielsan v. Preap*, 586 U.S. 392, 414 (2019).

[398] *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 386 (2013) (Thomas, J.) (citing *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011)).

[399] *See Bowe v. United States*, 607 U.S. __, 22 (2026) ("Congress presumably does not enact useless laws." (quoting *Garland v. Cargill*, 602 U.S. 406, 427 (2024))).

[400] *E.g.*, Naviwala Doc. 284 at 13 (stating that prosecutions can continue through delegation "even if there is *no* United States Attorney—confirmed, interim, acting, or otherwise").

[401] 28 U.S.C. § 515.

[402] 28 U.S.C. §§ 541(a), 541(b), 545; *see id.* § 547 (describing duties of United States Attorney).

[403] 28 U.S.C. § 546; *see also* 5 U.S.C. §§ 3345, 3346 (setting qualification requirements and time limits for temporary acting service).

general/specific canon teaches that "a general provision should not be applied 'when doing so would undermine the limitations created by a more specific provision.'"[404] Put another way, when a statute has expressly dealt with an issue, as sections 541, 545, 546, and 547 have with regard to the exercise of all of the powers of a United States Attorney, it would be error to conclude that Congress "also *sub silentio* provide[d] that [authority] far more broadly in another, more general, provision."[405] In the Appointments Clause context, the Supreme Court has even suggested in dicta that the existence of a statute providing for the appointment of a specific officer indicates that "Congress intended it to be the exclusive means of appointment."[406] The Government's reading would not only establish two *different* methods of appointment for the same position, but would use the more general statute to evade the limitations present in the more specific one. That interpretation cannot be countenanced.

Finally, when statutory text carries a "manifest purpose," the code should be interpreted so as not to hinder that objective.[407] Here, the United States Attorney provisions plainly indicate that Congress wished to vest the significant prosecutorial power of that Office only in individuals who were acceptable to both the President

---

[404] *Coady v. Vaughn*, 251 F.3d 480, 486 (3d Cir. 2001) (quoting *Varity v. Howe*, 516 U.S. 489, 511 (1996)).

[405] *Turner v. Rogers*, 564 U.S. 431, 453 (2011) (Thomas, J., dissenting, joined by Scalia, J. and Roberts, C.J. and Alito, J. in part).

[406] *Edmond*, 520 U.S. at 657 (but declining to accept the argument because the more specific statute was not sufficiently clear to authorize an appointment).

[407] Scalia & Garner, *supra* note 392, at 63.

*and* the Senate, and only for limited periods. Reading section 515 to permit the Attorney General to unilaterally appoint an officer with the same powers for an unlimited term directly conflicts with that purpose. "On the [Government's] reading, the President would have had no need *ever* to seek the Senate's advice and consent for his [United States Attorney] appointments: Whenever there was a fair prospect of the Senate's rejecting his preferred nominee, the President could have appointed that individual unilaterally" using section 515, which allows him to serve "*ad infinitum* . . . . It is unthinkable that such an obvious means for the Executive to expand its power would have been overlooked" by Congress.[408]

Additionally, recall that the Office of the United States Attorney predates the Bill of Rights. For nearly two-and-a-half centuries, Congress has maintained the express requirement of Presidential appointment and Senate confirmation for filling that office. Nothing in the history of the code indicates that Congress has ever meant to make the office easier to fill, and, to the contrary, the legislature immediately reversed itself the one time it created a loophole.[409] The importance Congress clearly attributes to this office instructs that "we would expect to see some affirmative indication of intent if [it] actually meant to make [section 515] a backdoor means to achieve the exact kind of [office filling] that the Code" elsewhere requires be done

---

[408] *Noel Canning*, 573 U.S. at 596 (Scalia, J., concurring, joined by Roberts, C.J., and Thomas and Alito, JJ.).

[409] *See Giraud*, 795 F. Supp. 3d at 581 (citing Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224 (2007)).

through the PAS process.[410] Section 515's language is too general to indicate such intent.[411]

All of these canons of interpretation drive toward one simple proposition: Courts "should not lightly conclude that Congress enacted a self-defeating statute."[412] I decline to do so. The statutory context overwhelmingly indicates that the term "any" in section 515 does not mean "all," because that reading would entirely defeat sections 541, 545, 546, and 547.

The Government's cases do not support its broader reading of section 515, and instead lend support to this narrower interpretation. Section 515 was interpreted at length during the 1970s due to the DOJ's use of "Organized Crime Strike Force[s]," which were staffed by attorneys commissioned under section 515.[413] At the outset, I note that reliance on this case law strikes me as questionable. Many of

---

[410] *Czyzewski v. Jevic Hldg. Corp.*, 580 U.S. 451, 465 (2017) (citing *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).

[411] *See New Process Steel*, 560 U.S. at 682 (requiring "some evidence of . . . intent" to permit a statute to contravene another provision explicitly vesting powers).

[412] *Quarles v. United States*, 587 U.S. 645, 654 (2019) (citing *Stokeling v. United States*, 586 U.S. 73, 77-82 (2019)).

[413] *See In re Persico*, 522 F.2d 41 (2d Cir. 1975); *United States v. Wrigley*, 520 F.2d 362 (8th Cir. 1975); *United States v. Prueitt*, 540 F.2d 995 (9th Cir. 1976). Although it is not always clear in the opinions, it *does not* appear that many of these special attorneys were originally appointed pursuant to section 515, but were instead already serving under a different statute and were merely reassigned through section 515. *See Persico*, 522 F.2d at 70 ("All Strike Force attorneys shall be appointed as Special Attorneys by the Deputy Attorney General, as provided by 28 U.S.C. § 543 and regulations issued pursuant thereto." (quoting DOJ Order No. 431-70 Strike Force Guidelines)). *But see United States v. Plesinski*, 912 F.2d 1033, 1037 n.5 (9th Cir. 1990) ("Sections 543 and 515 are considered independent statutory authorizations. Section 543 authorizes the appointment of attorneys to assist the U.S. Attorney, while section 515 authorizes the appointment of attorneys to assist the Attorney General.").

these opinions are explicitly purposivist and expressly disavow reliance on the plain text of the statute.[414] Moreover, none of this precedent is binding: it comes entirely from other Circuits and neither the Government nor the Court has found "very clear Third Circuit controlling precedent on how you interpret 515."[415] But even accepting these cases lenient interpretations, the Government's argument fails.

*In re Persico*, decided by the United States Court of Appeals for the Second Circuit, provides the most detailed analysis of the powers of section 515 Special Attorneys.[416] The defendant in *Persico* challenged the authority of a Special Attorney commissioned under section 515 to participate in the grand jury proceedings in his case, contending that the Attorney General's grant of power was too broad.[417] The panel reviewed Congress's purpose in passing section 515, the structure of the Strike Forces, and the historical context of the relationship between Main Justice and the

---

[414] *Persico*, 522 F.2d at 64 ("Plain and intrinsic meaning can mislead when it ignores the thought and intent behind words in a changing world. 'To disregard the natural implications of the statute and to imprison our reading of it in the shell of mere words is to commit the cardinal sin in statutory construction, blind literalism.'" (quoting *Pope v. Atlantic Coast R. Co.*, 345 U.S. 379, 392 (1953))).

[415] Naviwala Doc. 302 at 71:10-16; *see United States v. Birdman*, 602 F.2d 547, 561 & n.62 (3d Cir. 1979) (discussing Special Attorney appointed under sections 515(a) and 543 and noting that "Defendants do not challenge the authority of the Attorney General to appoint the SEC attorney as a Special United States Attorney" (citing *Persico*, 522 F.2d at 56-60)).

[416] *Persico*, 522 F.2d 41. At oral argument, I stated that the Government failed to cite *Persico* in its brief, implying that it may have been trying to hide unfavorable authority. *See* Naviwala Doc. 302 at 60:6-12. That was incorrect; although the Government did not develop its reasoning, it did cite *Persico* twice, and once in the relevant argument. Naviwala Doc. 284 at 2, 25. I regret any implication that AUSA Mark Coyne, who has comported himself admirably through two rounds of this challenging litigation, would attempt to mislead the Court in this manner, and I apologize to him personally for my error.

[417] *Persico*, 522 F.2d at 46.

USAOs.[418] Ultimately, the panel determined that the Attorney General had broad statutory authority to assign duties to subordinates both in general and under section 515, and approved the Special Attorney's authority to participate in the grand jury proceeding.[419] The panel specifically held that the Attorney General could assign the Special Attorney to conduct a grand jury inquiry "to the same extent as the United States Attorney."[420]

Despite this holding, the Second Circuit carefully distinguished the powers of these subordinates from those of the local United States Attorney.[421] Although the Strike Force Attorneys had significant autonomy to investigate crimes and prepare for prosecutions, "[a]ll indictments, prosecutions, memoranda, immunity authorization requests, wiretap applications, and nolle prosequis [we]re reviewed and approved by the [Strike Force's] Attorney-in-Charge and the local United States Attorney before they are filed."[422] More specifically, once a case reached the indictment phase, "the Chief of the Strike Force . . . operate[d] under the direction of the United States Attorney who . . . overs[aw] the judicial phase of the

---

[418] *Id.* at 46-54.

[419] *Id.* at 54-66.

[420] *Id.* at 56-57 (reasoning that both an Assistant United States Attorney and Special Assistant United States Attorney can "conduct a broad grand jury inquiry by virtue of his office.").

[421] *See In re Grand Jury Subpoenas*, 2026 WL 60793, at *11 ("[W]hile § 515 authorizes the Attorney General to appoint 'special attorneys' to 'conduct any kind of legal proceeding . . . which United States attorneys are authorized by law to conduct,' 28 U.S.C. § 515(a), such an appointment neither confers the office of U.S. Attorney nor does it validate subpoenas issued in a different capacity." (citing *Persico*, 522 F.2d at 45-46)).

[422] *Persico*, 522 F.2d at 51.

development of the case."[423] Only more senior *PAS* officers within Main Justice

could overrule the United States Attorney's litigation decisions.[424] With this structure

in mind, the Second Circuit analogized the Special Attorney's actions before the

grand jury to the powers of a Special Assistant United States Attorney, going so far

as to suggest that "the attorneys of the Strike Force are 'assisting' the United States

Attorney" and could participate in grand jury proceedings using the authority of a

section 543 office.[425]

The essence of the ruling was therefore not that the Special Attorney could act

as a full United States Attorney, but rather that his "authority . . . should be equal to

that held by assistants to a United States Attorney."[426] Through these limits on the

Strike Force Special Attorneys' power, "[t]he primary responsibility of the United

States Attorney to prosecute crimes in the district [wa]s recognized. Decentralization

[wa]s not ignored."[427] A year after *Persico*, the Second Circuit affirmed the dismissal

of a perjury charge brought by a Strike Force attorney because that attorney

"evade[d] the rules and supervision of the United States Attorneys."[428]

---

[423] *Id.* at 69 (quoting DOJ Order No. 431-70 Strike Force Guidelines).
[424] *Id.* at 70 (noting that Strike Force Chief cannot overrule United States Attorney on prosecution decisions without approval from Main Justice); *id.* ("The chain of command in all litigation shall be from the Attorney General to the Assistant Attorney General, Criminal Division, to the United States Attorney, to the Chief of the Strike Force.").
[425] *Id.* at 56 (citing 28 U.S.C. § 543).
[426] *Id.* at 63.
[427] *Id.* at 51.
[428] *United States v. Jacobs*, 547 F.2d 772, 774 (2d Cir. 1976).

Other section 515 cases permitting the assignment of authority to Special Attorneys also expressly distinguish the powers that they approve from those of a United States Attorney. Like in *Persico*, the defendant in *United States v. Wrigley* objected to Special Attorneys' authority to conduct grand jury proceedings, arguing that their appointment under section 515 "would allow the Attorney General to usurp, through the appointment of special attorneys, the function of the United States Attorneys."[429] And, as in *Persico*, the United States Court of Appeals for the Eighth Circuit similarly affirmed the Attorney General's broad power to authorize Special Attorneys to conduct a wide range of proceedings.[430] But the Court also made a point to note that "[t]here is no evidence in this record to support the view that the special attorneys do not act in conjunction with the United States Attorneys in a coordinated attack on crime."[431] Thus, it was not faced with a factual situation in which a Special Attorney was acting with the full power of a United States Attorney, and indicated that that different circumstances would compel a different conclusion.

*United States v. Prueitt* concerned primarily whether the section 515 Special Attorney's appointment letter was sufficiently "specific," and did not consider in any detail whether the scope of actual powers delegated was too broad.[432] Moreover, the appointment letter in *Prueitt* contained explicit limitations: the Special Attorney

---

[429]  520 F.2d at 365.
[430]  *Id.* at 367-68.
[431]  *Id.* at 368 n.13 (citing *Persico*).
[432]  540 F.2d at 1000-01 (discussing "validity of the authorization letter").

was authorized only to prosecute violations of the Controlled Substances Act and the Controlled Substances Import and Export Act.[433] Again, the Court did not confront a situation in which a Special Attorney was delegated all of the authority of a United States Attorney. Strike Force attorneys were similarly subordinated to the United States Attorney in New Jersey, as the Government concedes.[434]

Indeed, the fact that these courts made a point of distinguishing the situation that has now come to pass indicates that they thought such a delegation would be significantly more suspect than what was before them. Other courts at that time made the point even more explicitly. In *United States v. Weiner*, the late Honorable William J. Bauer writing for the United States District Court for the Northern District of Illinois noted that "attorneys specially appointed by the Attorney General (such as the strike force members) do not have the power or practical ability to usurp the function of a local United States Attorney" based on the structure of the Strike Force.[435] But only the practical "realities of federal criminal prosecution" protected a liberal interpretation of section 515(a) from the "danger" of wiping out the "statutory power" of United States Attorneys.[436]

Other cases also involve limited grants of power. For example, in *United States v. Hall*, the Ninth Circuit approved the operation of a Main Justice component

---

[433]  *Id.* at 1003.
[434]  Naviwala Doc. 310 at 20.
[435]  392 F. Supp. 81, 86 (1975).
[436]  *Id.* at 88.

within the Southern District of California.[437] The office was "separate and apart from the office of the United States District Attorney, staffed by attorney-officers of the Department of Justice, and supervised by a Special Assistant to the Attorney General."[438] The office eventually began to handle litigation fully independently of the District Attorney.[439] But that separation came only with the District Attorney's assent, and the office's jurisdiction was strictly limited to "handling the large number of land condemnation matters" that resulted from World War II.[440] Other courts have since limited *Hall* to its specific facts.[441]

The distinction in these cases is critical. I agree that courts have regularly approved broad delegations of authority to Special Attorneys appointed by the Attorney General. But on the express terms of those delegations or the specific facts of the cases, *no delegation* has *ever* encompassed the full powers of the United States Attorney.[442] Pressed at oral argument on this point, the Government agreed that "Strike Force delegations are more narrow" than the delegation in this case and

---

[437]  145 F.2d 781 (9th Cir. 1944).

[438]  *Id.* at 782.

[439]  *Id.*

[440]  *Id.*

[441]  *United States v. Williams*, 65 F.R.D. 422, 444-45 (W.D. Mo. 1974).

[442]  This distinction defeats the Government's reliance on section 515 appointments during recusals, *see* Naviwala Doc. 284 at 29-30, which cover only a limited set of cases and are authorized with the United States Attorney's assent. *See id.* at 29 (stating that "the Department typically appoints under 28 U.S.C. § 515 an AUSA to serve as Attorney for the United States *on the case*." (emphasis added)); *id.* at 30 (noting that the delegee "has decision-making authority within that USAO for *that matter or matters*" (emphasis added)). In the same way, Independent Counsel appointments are distinguishable because they are limited to a specific defendant or issue.

conceded that it was not aware of any case dealing with such a delegation "that was coextensive with the authority of a statutorily created PAS office."[443]

The closest example is *In re Sealed Case*.[444] There, the Attorney General sought and received appointment of Lawrence Walsh as Independent Counsel to investigate the Iran/Contra affair pursuant to the then-enacted Independent Counsel statute, the Ethics in Government Act ("Ethics Act").[445] After Oliver North challenged the Ethics Act's constitutionality, Attorney General Edwin Meese delegated Walsh "authority identical to that provided to an independent counsel by the Ethics Act."[446] The United States Court of Appeals for the District of Columbia Circuit approved that delegation and, as a result, declined to pass on the Ethics Act's constitutionality.[447] Thus, the Court approved a delegation of authority that "paralleled" an independent statutory office with a unique method of appointment (under the Ethics Act, Independent Counsel were appointed by a special division of the judiciary).[448]

Nevertheless, I find this case unconvincing and distinguishable. The D.C. Circuit's analysis of the Attorney General's authority to delegate the relevant powers spans exactly two sentences and a pair of footnotes: "The statutory provisions relied

---

[443] Naviwala Doc. 302 at 65:12-66:21.
[444] 829 F.2d 50 (D.C. Cir. 1987).
[445] *Id.* at 51-52 (citing 28 U.S.C. § 592, *et seq.*).
[446] *Id.* at 52-53.
[447] *Id.* at 55-57.
[448] *See* 28 U.S.C. § 593.

upon by the Attorney General in promulgating the regulation are 5 U.S.C. § 301 and 28 U.S.C. §§ 509, 510, and 515. While these provisions do not explicitly authorize the Attorney General to create an Office of Independent Counsel virtually free of ongoing supervision, we read them as accommodating the delegation at issue here."[449] With essentially no textual scrutiny or reasoning to speak of, there is no basis for relying on this case where it is not binding. Moreover, the Court was also clearly not concerned about an actual conflict between the delegated office and the statutory one, given that the same person—Walsh—had been appointed under *both* methods. Indeed, the Court reasoned that "[u]nder the particular circumstances of this case . . . the appointment to the one office carries over to the other."[450] So the D.C. Circuit never considered the issue of a conflict between the two offices. Accordingly, I conclude that *In re Sealed Case* is the product of its unique facts and should not be extended to different contexts.

*     *     *

Based on the foregoing review of every statute that arguably creates an inferior office in the Department of Justice which can be filled by the Attorney General or authorizes the Attorney General to create and fill an inferior office, I conclude that the Attorney General lacks the authority to appoint an inferior officer

---

[449] *In re Sealed Case*, 829 F.2d at 55. The footnotes merely state the text of the statutes and cite *Nixon*'s "presuppos[ition]" that the statutes permitted such appointments. *Id.* at 55 n.30 (citing *Nixon*, 418 U.S. at 694-96).
[450] *Id.* at 58.

with all of the powers of a United States Attorney except as explicitly permitted by section 546. And, as stated, under the facts and circumstances of this case, I view the powers of the triumvirate as a single, collective appointment. Moreover, even if each appointment is permissible in isolation, they cannot be combined to achieve the unlawful result of filling the United States Attorney's office via delegation.[451]

### ii.        Adding Powers by Delegation

However, the analysis is not yet finished. An office's functions and duties need not be fixed at the moment of appointment. If Congress has statutorily authorized a Department Head to expand the functions and duties of an inferior office, then he may do so without violating the Appointments Clause. Even if a new inferior office is created by the delegation, Congress has effectively authorized the Department Head to fill that office, which the Appointments Clause permits.[452] The Government argues that Congress has so legislated here in the form of 28 U.S.C. § 510, and that the powers entrusted to the triumvirate are therefore permissible. Section 510 is not so broad, and the delegation of the powers at issue to the triumvirate is not statutorily authorized. Instead, the Attorney General has effectively created a new inferior office (which she may not do) and unilaterally filled it (which she may not do). Accordingly, the triumvirate is serving unlawfully.

---

[451] *See supra* at 47-57.
[452] U.S. Const. art. II, § 2, cl. 2.

Section 510 is a simple statute. It provides that "[t]he Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General."[453] And, as stated, the Attorney General has many functions. She is the "head of the Department of Justice."[454] She has the powers granted under section 515 (discussed *supra*).[455] She "may personally conduct and argue any case in a court of the United States . . . or [s]he may direct the Solicitor General or any officer of the Department of Justice to do so."[456] She "supervise[s] all litigation to which the United States, an agency, or officer thereof is a party, and . . . direct[s] all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 . . . in the discharge of their respective duties."[457] And, through section 509, she is "vested" with "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice" with irrelevant exceptions.[458]

If the delegation power in section 510 has no limitations, then the Attorney General can certainly use whatever inferior officers she wants, including section 515 appointees, to litigate any cases in the country in whatever way she prefers. But

---

[453] 28 U.S.C. § 510.
[454] 28 U.S.C. § 503.
[455] 28 U.S.C. § 515.
[456] 28 U.S.C. § 518(b).
[457] 28 U.S.C. § 519.
[458] 28 U.S.C. § 509.

section 510 is not unlimited. A maximal view renders the statute internally contradictory and textually ambiguous. On such a reading, the Attorney General could delegate "any" of her functions, many of which are extremely significant and undoubtedly involve officer-level authority, to "any . . . employee."[459] But, by changing the employee's authority, such a delegation would necessarily elevate the "employee" to an "officer"—one whose appointment must comply with the Appointments Clause.[460] And unless the functions and duties that she delegates to the lucky employee happen to match one of the already existing inferior offices which Congress has permitted the Attorney General to fill on her own, the default PAS rule must apply.[461] Because this new officer was not Presidentially appointed and Senate confirmed, this hypothetical series of events violates the Appointments Clause.

Take the hypothetical further. An expansive view of section 510's language would seemingly permit the Attorney General to delegate all of her own functions to an employee. That would elevate a mere employee—appointable by *anyone*[462]— to the level of a principal officer—a role that can *only* be filled through the PAS process. The only answer to these contradictions is to conclude that "[s]ection 510

---

[459] 28 U.S.C. § 510.

[460] *See Weiss*, 510 U.S. at 170 n.4 (questioning "[t]he constitutionality of the provision allowing civilians to be assigned to Courts of Military Review, without being appointed pursuant to the Appointments Clause").

[461] U.S. Const. art. II, § 2, cl. 2.

[462] *Lucia*, 585 U.S. at 245 (citing *Germaine*, 99 U.S. at 510)

confirms the Attorney General's power to delegate his or her delegable functions, but it leaves to other sources of law the determination of which functions are delegable *and to whom*."[463]

Case law supports the conclusion that the Attorney General's power to delegate under section 510 is limited by other law. In *United States v. Giordano*, a unanimous Supreme Court held that the Attorney General could not delegate his authority to authorize applications for wiretap orders to an Executive Assistant, notwithstanding section 510.[464] Congress statutorily vested the power to authorize applications for a wiretap in "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General."[465] The Government argued that, notwithstanding the statute's identification of specific officers who could exercise the relevant authority, the Attorney General could assign it to any other officer in the Department of Justice pursuant to section 510.[466] The Supreme Court disagreed. It reasoned that "[d]espite [§] 510, Congress does not always contemplate that the duties assigned to the Attorney General may be freely delegated."[467] And, although the wiretap statute did not expressly preclude delegation to nonenumerated officers, the Court found that listing only the Attorney General and the Assistant

---

[463] Calabresi & Lawson, *supra* note 142, at 107.

[464] 416 U.S. 505 (1974); *see id.* at 548-49 (Powell, J., joined by Burger, C.J., and Blackmun and Rehnquist, JJ., concurring in part and dissenting in part) ("I . . . join Parts I, II, and III of the opinion of the Court.").

[465] *Id.* at 538 (citing prior version of 28 U.S.C. § 2516(1)).

[466] *Id.* at 512-13.

[467] *Id.* at 514.

Attorneys General indicated Congress's "inten[t] to limit the power . . . to the Attorney General himself and to any Assistant Attorney General he might designate."[468]

The Government attempts to limit *Giordano* to stand for the proposition that section 510 gives way *only* when "a specific limitation on *delegation* authority appears elsewhere in the statute."[469] But the reasoning of *Giordano* and the related case of *Halverson v. Slater* is not tied to *delegation* authority *per se*. Instead, the Courts reasoned that Congress's decision to vest the *powers* at issue in certain officers—in *Giordano* the Attorney General or Assistant Attorneys General, in *Halverson* Coast Guard officers—meant that the Department Head was not free to reassign them to different officers. In *Giordano*, the Court explained that section 510 had to give way because Congress "intended to *limit the power* to authorize wiretap applications to the Attorney General himself and to any Assistant Attorney General he might designate."[470] And in *Halverson*, the D.C. Circuit similarly reasoned that, by limiting the officers who could be delegated the relevant powers, Congress

---

[468] *Id.*; *see also Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997) (reasoning that general delegation provision gave way to more specific provision permitting delegation only to certain officers).

[469] Naviwala Doc. 310 at 5 (quoting *Touby v. United States*, 500 U.S. 160, 169 (1991)); *see id.* at 6 n.2 (similarly distinguishing *Halverson* as dealing only with a conflicting delegation statute).

[470] 416 U.S. at 514; *see id.* at 514-22 (discussing history of legislation for the proposition that Congress intended to limit the allocation of power to specific officers); *United States v. Touby*, 909 F.2d 759, 769-70 (3d Cir. 1990), *aff'd* 500 U.S. 160 (1991) (reasoning that in *Giordano* "the Court noted that Congress had specified in the Omnibus Crime Control and Safe Streets Act of 1968 the positions of individuals who had that *authority*" (emphasis added)).

intended to "preclude" the exercise of the relevant "duties and powers [by] non-Coast Guard officials."[471]

These power-focused readings of *Giordano* and *Halverson* are confirmed by the Supreme Court's reasoning in another delegation case: *New Process Steel, L.P. v. National Labor Relations Board*.[472] In *New Process Steel*, the NLRB, a five-member Board with a three-member quorum requirement, used its statutory authority "to delegate to any group of three or more members any or all of the powers which it may itself exercise."[473] It did so anticipating that the appointment of one of those three members would soon expire, but believed that "its action would permit the remaining two members to exercise the powers of the Board . . . [as] a quorum of the three-member group."[474] The Board's reasoning was supported by an OLC opinion.[475]

The Supreme Court rejected the NLRB's approach and concluded that "the delegee group [must] maintain a membership of three in order for the delegation to remain valid."[476] The Court reasoned that the statutory structure indicated that the "Board's delegated *power*" was to be vested in a group of no fewer three members.[477]

---

[471] 129 F.3d at 188.
[472] 560 U.S. 674 (2010).
[473] *Id.* at 676, 679 (citing 29 U.S.C. § 153(b)).
[474] *Id.* at 677, 679 (statutory text indicating that "two members shall constitute a quorum of" a delegated three-member group).
[475] *Id.*
[476] *Id.* at 680.
[477] *Id.* (emphasis added).

The Government's reading risked undercutting the three member quorum requirement, by "allow[ing] two members to act as the Board *ad infinitum*," resulting in the quorum requirement's "permanent circumvention," and by "allow[ing] a *de facto* delegation to a two-member group."[478] *New Process Steel* focuses on the conflict between the delegation statute and the statute *vesting power* (the three-member quorum requirement) and *not* a conflict between two delegation statutes.

Thus, the cases teach that, where Congress has specifically authorized only certain officers to exercise clearly defined powers, a Department Head cannot use a general delegation provision to reassign those same powers elsewhere. The Supreme Court has implied that such a limitation might apply even to a more specific delegation statute that explicitly permits officer creation. In *Edmond v. United States*, the petitioner argued that the Transportation Secretary's statutory power to "appoint and fix the pay of officers and employees of the Department of Transportation and . . . prescribe their duties and powers" could only be used to create officers "where Congress has not otherwise provided for the appointment of [that] specific officer."[479] The Court acknowledged the breadth of the Secretary's statutory delegation power, but agreed in dicta that, when a more specific statute defined the office and its method of appointment, the "argument that Congress intended [the office-creating statute] to be the exclusive means of appointment might

---

[478] *Id.* at 681.
[479] *Edmond*, 520 U.S. at 656 (citing 49 U.S.C. § 323(a)).

prove persuasive. Ordinarily, where a specific provision conflicts with a general one, the specific governs."[480] Ultimately, the Court found that analysis unnecessary because it determined that the office-specific statute at issue did not actually confer any appointment power at all, but rather permissibly expanded the duties that could be assigned to officers appointed pursuant to a different statute. And, because there was no conflict, the Secretary's general appointment authority could be used to create such officers.[481] But here, where the Attorney General's delegation power is less explicit and the United States Attorney statute undisputedly concerns the power to appoint, the conflict noted in *Edmond* is squarely presented.

For the same statutory interpretation reasons addressed in my analysis of section 515, which are unnecessary to fully restate here, I conclude that the Supreme Court correctly forecasted that an office-specific appointment statute provides the exclusive means of appointing an officer with those powers. Where such a statute exists, more general delegation provisions must give way. Here, that statute is section 541 (and section 546).[482] If the Attorney General can simply delegate any subordinate office's powers to any other inferior officer through section 510, *every* DOJ statute describing a specific inferior office and its method of appointment is

---

[480] *Id.* at 657 (citing *Busic v. United States*, 446 U.S. 398, 406 (1980)).

[481] *Id.* at 657-58 ("This analysis suggests that Article 66(a) concerns not the appointment of Court of Criminal Appeals judges, but only their assignment.").

[482] *See United States v. Gantt*, 194 F.3d 987, 1000 (9th Cir. 1999) ("The one significant statutory limit on the Attorney General's supervision of United States Attorneys is Congress' decision to vest appointment and removal power in the President." (citing 28 U.S.C. § 541)).

rendered superfluous, or at least avoidable at will. Moreover, that issue would present essentially *Government-wide*, given the ubiquity with which Congress has enacted general delegation statutes like section 510. And an alternative interpretation would present the same issues identified in *New Process Steel*—*ad infinitum* circumvention of the statutorily provided power structure and the opportunity for *de facto* office filling—thereby reinforcing my conclusion that the Government's interpretation of section 510 is incorrect.

The problem with the Government's argument is best illustrated with a hypothetical. If the general delegation authority is not limited based on Congress's statutory allocation of power to specific offices, the Attorney General has absolute authority to structure the DOJ however she wants, regardless of the offices Congress creates by statute.[483] Nothing prevents her from appointing an AUSA as an inferior officer and then delegating that person all of the authority necessary to act on par with, say, the Deputy Attorney General. If a section 515 special attorney can be delegated authority equal to a United States Attorney, why stop there? Why not

---

[483] The Government also repeatedly suggests that "§§ 509 and 510 authorize the Attorney General to require even Senate confirmed U.S. Attorneys to report to other attorneys within the department," Naviwala Doc. 310 at 8; Naviwala Doc. 284 at 20, but it does not develop that proposition with statutory analysis or case law. I accept the general proposition, but I do not agree that the Attorney General could delegate the authority to supervise United States Attorneys to *anyone* she wants. On the Government's maximalist reading, the Attorney General could require a United States Attorney to report to and receive approvals from one of his own AUSAs before acting, fully subverting Congress's statutory authority structure. I similarly doubt that a section 515 Special Attorney can be delegated power to supervise a United States Attorney, given my above analysis of the powers authorized by section 515.

appoint eleven section 515 attorneys and vest them with powers equivalent to the Assistant Attorneys General? Appoint a paralegal and delegate her the entire portfolio of the Attorney General herself? And, as noted, this power would extend well beyond the DOJ.

These hypotheticals might sound outlandish, but this is *explicitly* the Government's position. At oral argument, I asked the Government whether "sections 509 and 510 permit the Attorney General to delegate any and all authorities vested in any subordinate to any other subordinate." The Government confirmed that "the answer to that question is yes."[484] More specifically (and disturbingly), I posed a hypothetical in which the FBI Director, a subordinate of the Attorney General subject to the PAS rule,[485] reached his statutory ten-year term limit.[486] I asked whether, if the President wished to keep that individual in charge of the FBI but Congress refused to agree to an extension, the Attorney General could simply appoint him to another position and delegate to him or "a small group of people that he heads" "the authority to exercise the functions and duties of the office of the FBI director."[487] The Government answered that she could.[488]

---

[484] Naviwala Doc. 302 at 50:18-51:7.
[485] 28 U.S.C. § 532; Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 1101, 82 Stat. 197, 236 (1968).
[486] Crime Control Act of 1976, Pub. L. No. 94-503, § 203, 90 Stat. 2407, 2427 (1976).
[487] Naviwala Doc. 302 at 88:5-23.
[488] Naviwala Doc. 302 at 88:24-89:4.

Such a reading of section 510 cannot be countenanced. The provision's extremely broad and general language offers no indication that Congress intended to obliterate entirely the distinctions between different inferior officers. That would be the most extreme elephant in a mousehole that the Code has ever seen.[489] Instead, the Supreme Court's formulation provides the boundary. The delegation statute must give way to a position-specific office-creating statute, which is "the exclusive means of appointment" for an officer exercising the powers of that office.[490]

Congress has statutorily created the office of the United States Attorney,[491] subjected it to the PAS process,[492] set limitations on who may hold it,[493] and defined its powers.[494] Those statutes provide the exclusive means for authorizing an inferior officer to exercise such authority, and thereby hold the office. But here, while the Office of the United States Attorney is vacant, the Attorney General has delegated powers equivalent to those of that office to a small, specific group of individuals, none of whom has been appointed in a manner that satisfies the United States Attorney statute. In doing so, she has unilaterally created a new multi-member-

---

[489] *Whitman*, 531 U.S. at 468.

[490] *Edmond*, 520 U.S. at 657; *see Halverson*, 129 F.3d at 184 (summarizing prevailing party's argument as "the scope of [a general delegation statute] cannot be determined without reference to the specific power being delegated, the authority of the delegatee to exercise the power and any limitations that may be imposed by other, more specific statutory provisions"); Calabresi & Lawson, *supra* note 142, at 107.

[491] 28 U.S.C. § 541.

[492] *Id.* § 541(a).

[493] *Id.* § 545; *see id.* § 546.

[494] *Id.* § 547.

inferior-office and appointed individuals to fill it without following the Constitutional default rule of PAS appointment.[495] Accordingly, that delegation violates both the statutory scheme and the Appointments Clause of the Constitution,[496] and the triumvirate must be disqualified from exercising these powers.

### b.    Direct Authority of the Attorney General

Because the Government's argument is so heavily rooted in its factually unsupported theory that the triumvirate is exercising the statutory powers of the Attorney General and not those of the United States Attorney, I take a moment to recap why that is incorrect.

First and second, outside of the briefing in this litigation, the Government has never described the delegation as one of the Attorney General's authority. The Appointment Order refers to the powers of the vacant office and says that the triumvirate is filling that role, and an accompanying Memorandum—approved by the Attorney General—states that the "responsibilities" being "delegate[d]" are those of the "United States Attorney."[497] Those contemporaneous explanations of the

---

[495]  *See supra* at 32-33 (discussing Executive's lack of authority to expand powers of an office).

[496]  *See Comey*, ___ F. Supp. 3d ___, 2025 WL 3266932, at *10 (reasoning that appointments that do not comply with statute necessarily violate the Appointments Clause).

[497]  Naviwala Doc. 268-2 at 4.

Attorney General's actions are far more persuasive than "counsel's *post hoc* rationalizations."[498] So I merely hold the Government to its own description.

Third, the Government continues to operate the USAO-NJ exactly as it would with a properly appointed United States Attorney. The work of the District continues to be funded almost entirely through an appropriation earmarked for "United States Attorneys."[499] Even if that appropriation can be reassigned freely, which I doubt based on the appropriations statutes, the Government has not reappropriated the relevant funds to a different account that would reflect the change in authority.[500] More generally, I doubt that the Attorney General can alter the source of authority for a major component of the Department of Justice by simply swapping a non-PAS subordinate with delegated authority into the exact hierarchical position of the independently statutorily empowered PAS United States Attorney. Functionally, the Government's argument strikes me as equivalent to transferring all of the functions of the USAO-NJ to Main Justice—a point that the Government itself used as an

---

[498] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see Coinbase*, 126 F.4th at 200 ("[W]e look only to what the agency said at the time of the action— not to its lawyers' post-hoc rationalizations." (quoting *Good Fortune Shipping*, 897 F.3d at 263)); *Logic Tech. Dev. LLC v. U.S. Food & Drug Admin.*, 84 F.4th 537, 549 (3d Cir. 2023).

[499] Naviwala Doc. 304-1.

[500] *See* Letter from Assistant Attorney General for Administration Jolene Ann Lauria, U.S. Dep't of Justice, to Congressman Hal Rogers, U.S. H.R. (Jan. 16, 2026) (providing notice under section 505 of the appropriations acts that DOJ is undertaking a reorganization within the Department of Justice to create a National Fraud Enforcement Division).

analogy.[501] But when such major changes occur, the Government at the very least promulgates a rule to that effect, as it did twice in the same month as this delegation for other transfers of functions.[502] Further, it is in no way clear to me that the formal steps required to effectuate certain reorganizations under the Administrative Procedure Act would not apply here.[503]

Fourth, and most simply, the Government has openly admitted that it wants to fill United States Attorney positions unilaterally.[504] One does not need a legal education to see that that is happening here.

If the Government wants to fundamentally restructure the Department of Justice to get its way, it must *actually do so*, and must do so within the administrative system that Congress has legislated. Here, all of the evidence indicates that it has not. No matter how adamantly it presses its position in litigation, it cannot change the facts. The Government has delegated the authority of the United States Attorney.

---

[501] Naviwala Doc. 302 at 84:14-23 ("[T]he Attorney General herself can pull every single case here and concentrate it, have it be run out of main justice. Every single one. And I know of no principle that would prohibit the Attorney General from doing that.").

[502] *See* Transfer of the Functions of the Tax Division to the Civil Division and the Criminal Division, 90 Fed. Reg. 57,139 (Dec. 10, 2025); Consolidation of the Office of the Executive Secretariat into the Justice Management Division, 90 Fed. Reg. 60,570 (Dec. 29, 2025).

[503] *See* 5 U.S.C. § 903(a)(4) (requiring submission of a reorganization plan to Congress for "the consolidation or coordination of part of an agency or the functions thereof with another part of the same agency or the functions thereof"); 5 U.S.C. § 801(a)(1)(A) (requiring submission of report regarding a "rule" to Congress before it may take effect); 5 U.S.C. § 804(3)(C) (defining "rule" to include "any rule of agency organization, procedure, or practice that. . . substantially affect[s] the rights or obligations of non-agency parties.").

[504] *Supra* at 8-12.

## IV.    Remedy

Having found the triumvirate's authority statutorily and Constitutionally unlawful, I now turn to the proper remedy. Both defendants seek at least disqualification of the triumvirate, and it is clear that such a remedy is proper.[505] I therefore disqualify the triumvirate from engaging in the prosecutions of Naviwala and Torres, and from supervising the same.[506] Any AUSA who prosecutes Naviwala or Torres under the supervision or authority of any member of the triumvirate in violation of my Order is similarly subject to disqualification.[507]

Both defendants also seek dismissal of their indictments. Naviwala has already been tried and convicted by a jury of his peers, and dismissal is not proper in his case. But Torres is subject to a superseding indictment returned under the authority of Ms. Habba during a period when she was acting without lawful authority. I believe that additional briefing is necessary to properly decide whether AUSAs could obtain an indictment under an unlawfully serving United States Attorney, and I therefore defer that issue.

### A.    Naviwala

Naviwala asserts three arguments for dismissal. He first contends that the presence of an unlawful prosecutor entirely deprives the Court of jurisdiction over

---

[505] *Giraud*, 160 F.4th at 406-07 (affirming disqualification of Ms. Habba).
[506] *See Giraud*, 795 F. Supp. 3d at 606 (disqualifying Ms. Habba from supervising others).
[507] *Id.*

the case and thus requires dismissal.[508] Second, he asserts that the prosecutorial problems in the USAO-NJ have so delayed his sentencing that his due process rights have been violated.[509] And, third, he contends that the Court should dismiss his indictment using its supervisory authority as a sanction for the Government's behavior.[510] None of these arguments is convincing.

### 1.    Jurisdiction

The Government cogently refutes Naviwala's argument that a Court is deprived of jurisdiction due to an Appointments issue. "That [an officer] was improperly appointed does not alter the Executive Branch's interest or power in having federal law enforced . . . . While the failure to have a properly confirmed [officer] may raise Article II Appointments Clause issues, it does not implicate our Article III jurisdiction to hear this case."[511] The Supreme Court has repeatedly stated that appointments issues are "nonjurisdictional,"[512] and has remanded cases or otherwise permitted ratification or correction even in the face of appointments problems.[513] Even when unauthorized prosecutors have arguably been involved,

---

[508] Naviwala Doc. 281 at 28-30.

[509] *Id.* at 30-37.

[510] *Id.* at 41-45.

[511] *Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1189 (9th Cir. 2016).

[512] *Freytag*, 501 U.S. at 877-78 (1991); *see United States v. Fitzhugh*, 78 F.3d 1326, 1330 (8th Cir. 1996) ("[A]lleged defects [in the authority of a prosecutor] have consistently been treated as non-jurisdictional and therefore subject to waiver, either by a valid guilty plea or by the absence of a timely objection.").

[513] *See Buckley*, 424 U.S. at 137-41; *Lucia*, 585 U.S. 237 (remanding cases for rehearing after invalidating appointments of presiding administrative law judges).

courts have determined that the Government's power to prosecute was unaffected from a jurisdictional standpoint.[514]

In any event, to the extent there is a jurisdictional issue, it began no later than July 1, 2025, and thus does not reach back to Naviwala's indictment or trial.[515] The issue can therefore be remediated by correcting the appointment problem, and courts should generally "permit[] [a] cure of actual defects in the court's jurisdiction."[516] Given the corrective options available to the Government,[517] immediate dismissal is not the proper remedy at this stage of Naviwala's case.

### 2. Sentencing Delay

"Convicted defendants have a due process right to a speedy sentencing."[518] This due process right works in conjunction with Federal Rule of Criminal Procedure

---

[514] *See United States v. Suescun*, 237 F.3d 1284, 1287-88 (11th Cir. 2001) ("In sum, even if we were to assume that Keefer's appointment as temporary United States Attorney was invalid—because it was not made in conformance with the Appointments Clause—we conclude that the appointment did not deprive the district court of jurisdiction to entertain the case and to adjudicate Suescun guilty of the charged offenses."); *Fitzhugh*, 78 F.3d at 1329-30 (holding that challenge to Independent Counsel's authority was nonjurisdictional and therefore waived by guilty plea); *United States v. Easton*, 937 F.2d 160, 161-62 (5th Cir. 1991) (holding that challenge to United States Attorney's power to authorize AUSA's signature on indictment was nonjurisdictional and therefore waived). *Contra United States v. Singleton*, 165 F.3d 1297, 1299-1300 (10th Cir. 1999) ("[A] federal court cannot even assert jurisdiction over a criminal case unless it is filed and prosecuted by the United States Attorney or a properly appointed assistant." (citing *United States v. Providence J. Co.*, 485 U.S. 693, 699-708 (1988))).

[515] *Giraud*, 795 F. Supp. 3d at 582.

[516] *T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 329 (3d Cir. 2019).

[517] *See supra* at 8-9 (discussing valid methods of appointment).

[518] *United States v. Small*, No. 22-1469, 2023 WL 4399212, at *3 (3d Cir. July 7, 2023) (unpublished); *see also Betterman v. Montana*, 578 U.S. 437, 448 (2016) ("After conviction, a defendant's due process right to liberty, while diminished, is still present. He retains an interest in a sentencing proceeding that is fundamentally fair."); *United States v. Lacerda*, 958 F.3d 196, 219-20 (3d Cir. 2020).

32(b)(1), which provides that sentence must be imposed "without unnecessary delay."[519] In determining whether a defendant has been deprived his due process right to a speedy sentencing, the Third Circuit uses the framework set out by the Supreme Court in *Barker v. Wingo*, considering four factors: "(1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right; and (4) any prejudice suffered by the defendant."[520] Here, only one of the factors even arguably cuts in Naviwala's favor, and the rest spell the end of this argument.

As to length of delay, problematic delays tend to run into the years, not merely several months.[521] In pure length terms, Naviwala was convicted approximately one year ago and has not yet been sentenced. However, in considering the reason for delay, a delay requested by the Defendant should not be counted against the Government.[522] Naviwala expressly requested continuances in his sentencing until

---

[519] Fed. R. Crim. P. 32(b)(1). The due process and Rule 32 inquiries overlap. *See Lacerda*, 958 F.3d at 219-220; *Small*, 2023 WL 4399212, at *7 (Roth, J., dissenting).

[520] *Lacerda*, 958 F.3d at 219-20 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

[521] *See Lacerda*, 958 F.3d at 220 (finding two-and-a-half year delay to be substantial); *Small*, 2023 WL 4399212, at *4 (four year delay was substantial); *Burkett v. Fulcomer*, 951 F.2d 1431, 1439 (3d Cir. 1991) (over two year delay was sufficient to meet the threshold requirement); *United States v. James*, 712 F. App'x 154, 162 (3d Cir. 2017) (noting that a fourteen month delay is "not as egregious" as other delays reported) (quoting *Burkett*, 951 F.2d at 1439); *United States v. Sater*, 2022 WL 836826, at *3 (M.D. Pa. Mar. 21, 2022) (finding a sixteen month delay sufficient to trigger an inquiry into the *Barker* factors but giving it minimal weight); *see also United States v. Ray*, 578 F.3d 184, 202 (2d Cir. 2009) (delay of fifteen years sufficient to vacate sentence). Some authorities state that the length of delay is a threshold inquiry that must be met before the other *Barker* factors come into play. *Small*, 2023 WL 4399212, at *4 (quoting *Burkett*, 951 F.2d at 1439).

[522] *Lacerda*, 958 F.3d at 220 (finding the reasons for the delay factor weighed "heavily against" the defendant where the defendant sought several continuances but the Government did not); *Small*, 2023 WL 4399212, at *4 (finding that delays consented to by the defendant weigh

at least September 30, 2025, so the delay should be calculated from no earlier than that point.[523] On that review, his sentencing has only been delayed by five months, and is nowhere near a length that would cut in his favor.

Considering the reasons for delay and Defendant's assertion of his right, although Naviwala contends that the delay is due to the Government's intransigence, it is beyond reasonable dispute that the issues presented in this case and *Giraud* are unsettled, and delays intended to gain clarity on the law do not "weigh strongly, if at all, against the government."[524] Naviwala has timely asserted his right to a speedy sentencing, but his motions for continuances do undercut the significance of this factor to some extent.

Finally, "'only unusual or specific problems of personal prejudice will satisfy the *Barker* test' and in a post-conviction context, we generally treat a person awaiting sentencing as suffering no unusual anxiety compared to any other convicted defendant with pending post-trial or appellate matters."[525] Naviwala claims that he is prejudiced because he is on home detention which does not count as time served for his ultimate sentence. The Government convincingly responds that Naviwala is

---

against the defendant, not the Government); *James*, 712 F. App'x at 162 (excluding delays attributable to defendant's own motions from consideration of the length of delay).

[523] Naviwala Docs. 227, 231.

[524] *Small*, 2023 WL 4399212, at *5 (quoting *Gov't of V.I. v. Burmingham*, 788 F.2d 933, 937 (3d Cir. 1986)).

[525] *James*, 712 F. App'x at 163 (quoting *Heiser v. Ryan*, 15 F.3d 299, 305 (3d Cir. 1994)). The general structural prejudice that stems from Appointments Clause violations, on which Naviwala so heavily relies, is not the kind of "*specific* problem[] of *personal* prejudice" that is required for dismissal due to a delay in sentencing.

free to report to prison now in order to begin serving his time. On balance, Naviwala

has come nowhere near demonstrating that dismissal is necessary on a due process

or Rule 32 analysis.

### 3. Supervisory Authority

Naviwala also argues that the Court should dismiss his indictment under its

supervisory powers to remedy the Government's "bad faith." The Third Circuit has

explained that, to use inherent authority, two requirements must be met: "(1) it 'must

be a reasonable response to the problems and needs confronting the court's fair

administration of justice,' and (2) it 'cannot be contrary to any express grant of or

limitation on the district court's power contained in a rule or statute.'"[526] As to the

first requirement, "a court may dismiss an indictment based upon its inherent

authority only if the Government engaged in misconduct, the defendant was

prejudiced, and no less severe remedy was available to address the prejudice."[527]

Here, I am not yet willing to conclude that the Government is acting in bad faith by

attempting to fill the office of the United States Attorney using alternative methods.

Both cases have involved arguable legal issues, and in this iteration the Government

has employed a strategy that was expressly left open in *Giraud*.

---

[526] *United States v. Wright*, 913 F.3d 364, 371 (3d Cir. 2019) (quoting *Dietz v. Bouldin*, 579 U.S. 40, 46, 47-48 (2016)).
[527] *United States v. Wright*, 913 F.3d at 371.

Nevertheless, given the Government's acknowledgment that it has several undisputedly legal methods readily available to fill the Office, the Court will not countenance another novel attempt to game Congress's statutory scheme, which I have by now spelled out in painstaking detail. The work of the USAO-NJ is simply too important to continue throwing novel leadership plans at the wall to see what will stick. Compromise is part of the system, and I implore the Government to take that approach. If it does not, it is on notice that a third attempt at unilateral office-filling will be met with extremely strict scrutiny, and any deficiency in its method will be taken as bad faith and result in dismissal of cases *at any stage*.

### B.    Torres

Torres argues that his superseding indictment should be dismissed because Ms. Habba signed it at a time when her appointment had already been rejected by this Court. The Government responds that Torres's superseding indictment was also signed by AUSAs, that Ms. Habba remained a validly appointed Special Attorney at the time she signed the superseding indictment, and that Torres has not suffered any prejudice as a result of Ms. Habba's role in seeking the superseding indictment as it was returned by a grand jury without Ms. Habba's direct or immediate supervisory involvement. The Government's first argument is a strong one, and I applied a

version of it in *Giraud*.[528] But my research in this matter indicates that the argument rests on a much thinner reed than was previously apparent, and I believe that additional briefing is necessary before I can resolve this final issue.

The Government's argument is fundamentally rooted in its contention that the AUSAs who participated in the grand jury process for Torres's superseding indictment remained valid attorneys for the Government and could continue to exercise prosecutorial authority even if they were supervised by a person who lacked such authority.[529] The statutory basis for this argument is that AUSAs are appointed by the Attorney General, not United States Attorneys,[530] and "authorized" AUSAs are among the "attorney[s] for the government" who may appear before a grand jury and sign an indictment.[531] Additionally, the Attorney General "direct[s] all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties."[532] Based on these propositions, many courts have held that "AUSAs are themselves

---

[528] *Giraud*, 2025 WL 2196794, at *5-6; *see Giraud*, 795 F. Supp. 3d at 604-06. I also reasoned that the indictment was further legitimated because the internal approvals had begun before Ms. Habba's authority became unlawful. *See id.* at 605-06

[529] Naviwala Doc. 284 at 42-43; *see id.* at 21-22 (arguing that AUSAs "retain prosecutorial authority" in the absence of a validly appointed United States Attorney).

[530] 28 U.S.C. § 542(a). In practice this authority has been delegated and redelegated several times. 28 C.F.R. §§ 0.15(b)(1)(v), 0.15(c), 0.15(e); U.S. Dep't of Justice, Justice Manual § 3-4.300(A) ("With respect to Assistant United States Attorneys authority has been delegated to the Deputy Attorney General, with certain authorities redelegated to the Director, EOUSA. The Director's authority may not be redelegated. The authority to appoint Assistant United States Attorneys has been delegated to the Director, OARM." (citing 28 C.F.R. § 0.15)).

[531] Fed. R. Crim. P. 1(b)(1)(B); *id.* 6(d)(1); *id.* 7(c)(1).

[532] 28 U.S.C. § 519.

representatives of the government . . . their ability to act does not hinge on the authority of the local United States Attorney, but derives from the Attorney General's plenary power over litigation to which the United States is a party."[533] Applying this rule, courts have repeatedly declined to consider challenges to the appointment of a United States Attorney or refused to dismiss indictments even if a United States Attorney was improperly appointed.[534]

After a thorough review, however, it does not appear that any of these courts has conducted a detailed textual analysis of the relevant statutory provisions. Nor did I do so when I previously relied on these cases in a preliminary decision issued with fewer than four days of consideration.[535] And in many cases, the relevant statement of law was either pure dicta or not necessary to the holding because of

---

[533] *E.g. United States v. Hilario*, 218 F.3d 19, 22 (1st Cir. 2000); *United States v. Gantt*, 194 F.3d 987, 998 (9th Cir. 1999) (citing Fed. R. Crim. P. 7(c)(1)); *United States v. Baldwin*, 541 F. Supp. 2d 1184, 1214 (D.N.M. 2008) (applying reasoning to indictment); *United States v. Tafoya*, 541 F. Supp. 2d 1181, 1183-84 (D.N.M. 2008); *United States v. Baker*, 504 F. Supp. 2d 402, 406-07 (E.D. Ark. 2007); *United States v. Ruiz Rijo*, 87 F. Supp. 2d 69, 71 (D.P.R. 2000); *United States v. Kouri-Perez*, 47 F. Supp. 2d 164, 165-66 (D.P.R. 1999); *cf. Suescun*, 237 F.3d at 1287-88.

[534] *See generally* cases in prior footnote; *United States v. Ramirez*, 807 F. Supp. 3d 1086, 1112-14 (C.D. Cal. 2025) (permitting disqualified Acting United States Attorney to continue supervising cases as First Assistant United States Attorney); *United States v. Ramirez-Martinez*, 2026 WL 113431, at *21-24 (D.N.M. Jan. 14, 2026) (same); *United States v. Ndissi*, 2026 WL 318836, at *4-6 (D. Vt. Feb. 5, 2026) (similar); *United States v. Garcia*, 2025 WL 2784640, at *15-16 (D. Nev. Sept. 30, 2025) (declining to dismiss indictment when signed by AUSAs); *United States v. Dillard*, 2026 WL 560356, at *4-5 (E.D. Va. Feb. 27, 2026) (same).

[535] *See United States v. Giraud*, 2025 WL 2196794, at *9 n.91 (D.N.J. Aug. 1, 2025). Notably, despite this "general[]" conclusion, I suggested that the delegation of authority from the Attorney General to AUSAs would need to flow through "another Department of Justice official with sufficient authority to extend Ms. Bondi's powers," which likely meant a "Senate-confirmed official[] in main justice." *Id.* at *10 & n.98. Thus, I did not suggest that AUSAs could continue with prosecutions based purely on their own authority.

factual circumstances that validated the action even without a United States Attorney.[536] In any event, none of the cases is binding authority (or even in Circuit). This entire line of authority appears to stem from *United States v. Gantt* and *United States v. Hilario*. In both cases the proposition was dicta.[537] Moreover, *Gantt* cited to *United States v. Plesinski*, a case involving the invalid appointment of a Special Assistant United States Attorney[538]—not a United States Attorney—and *United States v. Kouri-Perez*, which itself only analyzed the Federal Rules of Criminal Procedure.[539] *Hilario*'s analysis consisted of a single sentence immediately followed by the point that the validly appointed Solicitor General had approved the appeal.[540] The subsequent cases cite back to *Gantt* and *Hilario*, or to each other.

Based on my statutory interpretation of the AUSA statute *supra*, I find this line of case law significantly less convincing than on my previous analysis.[541] Furthermore, I have now reviewed DOJ regulations in detail and have yet to find a

---

[536] *Tafoya*, 541 F. Supp. 2d at 1183 (challenged United States Attorney "was not acting as the United States Attorney at the time the Superseding Indictment was filed in this case"); *Baldwin*, 541 F. Supp. 2d at 1214 ("The indictment against Baldwin was filed before [the alleged improper United States Attorney's] appointment as United States Attorney."); *Baker*, 504 F. Supp. 2d at 408 (death penalty approved by Attorney General or Deputy Attorney General and "the filing of the Second Superseding Indictment in February 2007 would have been made during the tenure of a validly appointed interim U.S. Attorney"); *cf. Easton*, 937 F.2d at 161-62 (holding waived argument that indictment signed by AUSA at the direction of United States Attorney before he was disqualified was invalid because the issue was not jurisdictional).

[537] *Gantt*, 194 F.3d at 998 (contrasting validity of indictment from actual issue of validity of 18 U.S.C. § 3731 certification); *Hilario*, 218 F.3d at 22 (appeal approved "by the Solicitor General—a person whose authority is not in doubt").

[538] 912 F.2d 1033.

[539] 47 F. Supp. 2d 164.

[540] 218 F.3d at 22.

[541] *See Giraud*, 2025 WL 2196794, at *5-6.

clear delegation of authority from the Attorney General to AUSAs that does not flow through the United States Attorney.[542] The idea that the Attorney General implicitly delegates full prosecutorial authority to AUSAs without any clear limits or defined supervisory structure strikes me as problematic to say the least.

Unfortunately, although it is squarely presented, this issue is severely underdeveloped in the briefing. Torres does not discuss any of the above-cited cases for the relevant propositions, and the Government only does so in service of its primary merits argument. The consequences of this aspect of my ruling have the potential to be extremely significant. Although I am loath to order yet more briefing and further delay final resolution of this matter, I can neither apply a line of precedent that may rest on a foundation of sand nor depart from that precedent without sufficient argument.

Accordingly, I defer my decision on Torres's motion to dismiss the superseding indictment pending additional supplemental briefing addressing this issue. The parties shall specifically discuss, in order:

1. The proper interpretation of 28 U.S.C. § 542 and, to the extent relevant, 28 U.S.C. §§ 509-510, 515-19, 547, and Federal Rules of Criminal Procedure 1(b)(1)(B), 6(d)(1), and 7(c)(1);

---

[542] *See generally* 28 C.F.R. § 0; U.S. Dep't of Justice, Justice Manual.

2.      The precedential value of *Gantt*, *Hilario*, and *Suescun*, as well as the cases following them;

3.      Whether any earlier cases directly bear on the question of AUSAs' authority to prosecute independently of a United States Attorney or a delegation of authority from the Attorney General other than section 542;

4.      Whether the Attorney General has, by regulation, internal guidance, order, or any other legally effective means other than section 542, delegated her authority to AUSAs without requiring a redelegation by a United States Attorney;

5.      The general legality of subordinates' continued exercise of delegated authority in the total absence (i.e. vacancy) of the delegator;

6.      Whether an indictment is valid in the absence of *any* prosecutor with sufficient authority; and

7.      The Government should also explain, as a factual matter, whether and how officers at Main Justice supervised the preparation and approval of Torres's superseding indictment.

The parties should not address Ms. Habba's role in the grand jury process as Special Attorney or First Assistant United States Attorney. Under *Giraud*, she lacked authority to take any action in either of those positions at the time of Torres's

indictment because, regardless of title, she was unlawfully exercising the full functions and duties of the United States Attorney.[543] The stay I imposed in *Giraud* did not somehow validate her actions during the pendency of that appeal; it simply delayed her disqualification in *those* cases.[544] And although she was not disqualified from Torres's case, the stay could not vest Ms. Habba with authority that she never properly had. The validity of Torres's indictment turns solely on the AUSAs' authority, and that is all that should be addressed in the supplemental briefing.

## V.    CONCLUSION

For the above-stated reasons, I conclude that the triumvirate has been unlawfully delegated the authority of the United States Attorney for the District of New Jersey in violation of the FVRA, the statutory offices its members purport to hold, and the Appointments Clause of the United States Constitution. Accordingly, they are disqualified from supervising the prosecutions of Naviwala and Torres. Naviwala's motion to dismiss his superseding indictment is denied. Torres's motion to dismiss his superseding indictment is deferred pending supplemental briefing.

---

[543] *Giraud*, 160 F.4th at 402-06 (rejecting Government's argument that Ms. Habba "may continue to exercise prosecutorial and supervisory authority . . . pursuant to the Attorney General's express delegation of authority to her in her capacity as Special Attorney and First Assistant U.S. Attorney."). In addition to *Giraud*'s FVRA rationale, the delegation of all of the authority of the United States Attorney to Ms. Habba as a Special Attorney or First Assistant United States Attorney was also invalid for the reasons described *supra* at 71-114.

[544] *White v. Johnson*, 79 F.3d 432, 437 (5th Cir. 1996) ("A stay does not reverse, annul, undo or suspend what has already been done *or what is not specifically stayed*." (emphasis added)); *see Nken v. Holder*, 556 U.S. 418, 428-29 (2009); *Graddick v. Newman*, 453 U.S. 928 (1981).

Recognizing the novelty of these legal questions, I believe that a stay of this decision is appropriate to ensure a speedy appeal.[545] However, my reasoning makes clear that a stay cannot validate an unlawful appointment. If the Government chooses to leave the triumvirate in place, it does so at its own risk.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge for
the Middle District of Pennsylvania
Specially Presiding

---

[545]  Naviwala Doc. 302 at 136:6-18 (Government requesting stay).